808 So.2d 397 (2000)
In re ADOPTION OF EHM.
No. 00 CI 2705.
Court of Appeal of Louisiana, First Circuit.
December 15, 2000.
*399 Sandra B. Terrell, Madisonville, Randall A. Fish, Lacombe, for Appellant, ACM.
G. Phyllis Gremillion, Baton Rouge, for Appellees, prospective adoptive parents.
Suzanne E. Bayle, Covington, for the minor child, EHM.
Dawn Amacker, Bogalusa, for Intervenor, MM.
Before: CARTER, C.J., FOIL, and WEIMER, JJ.
WEIMER, J.
EHM was born October 31, 1999, in St. Tammany Parish. On March 30, 2000, his mother, TLM, voluntarily surrendered her parental rights so EHM could be adopted. EHM's biological father,[1] ACM, legally opposed the adoption. Because ACM is presently incarcerated, he requested that he be granted legal custody of the child, but that physical custody be granted to MM, his maternal aunt.[2] After a trial, the district court denied ACM's claim of parental rights[3] and dismissed his opposition to the adoption. ACM appeals.
TLM testified her relationship with ACM began on Christmas Day 1998. In March 1999 she learned she was pregnant. She immediately told ACM. He and her mother talked her out of having an abortion.
In May 1999 she and her young son Blaze, a child of a previous relationship, moved in with ACM's family. She was receiving a $341 disability[4] check from the SSI program and food stamps. She was also participating in the WIC program, which provided necessities such as infant formula. ACM's parents allowed her to live with them rent-free and provided her with transportation for doctor visits as she had no vehicle and did not know how to drive. She testified that all of the baby's clothes were given to her at a baby shower. She stated ACM gave her absolutely no financial support either while she was pregnant or after the baby was born.
ACM testified he was earning approximately $1,200 per month working for his uncle's siding business in 1999. He stated he spent his salary on the electric bill at his parent's home, buying gas and insurance for his car, and going out to barrooms. Contrary to TLM's testimony that he never spent any money on her or the baby, ACM testified he bought a wind-up elephant toy and a couple of outfits for the baby and also bought all of Tammy's maternity clothes. He also thought he gave her money once to buy prenatal vitamins and "some kind of cream." He stated he did not offer to help with her medical expenses for prenatal care and delivery because she told him Medicaid was paying for it all.
TLM testified ACM spent his money on alcohol and going out to barrooms. No one disputes that ACM has a serious substance abuse problem. Dr. Myrna Bobet, *400 ACM's expert forensic psychiatrist, diagnosed ACM as suffering from polysubstance abuse. He told Dr. Bobet he started using alcohol and marijuana when he was fifteen years old. He had experimented with cocaine, LSD, and ecstasy. He has been arrested twice for driving while intoxicated, pleading guilty both times to first-offense DWI. When he was admitted to Lakeview Regional Medical Center in Covington in May 1999, a drug screen was positive for marijuana, cocaine, and amphetamines, and his blood alcohol level was.135. On May 30, 1999, in giving his medical history upon admission to East Lake Hospital in New Orleans, he admitted he used marijuana daily and drank alcohol frequently. He testified he failed a drug screen while on probation due to marijuana use. He had been in various outpatient substance-abuse programs five times in four years, but had never completed one, which he attributed to "stubbornness" on his part.
ACM also has a lengthy criminal record, which Dr. Bobet attributes to his substance abuse problem. When he was fifteen years old, he was arrested for possession of stolen property. He received probation, but was then arrested for burglary. He was sent to Louisiana Training Institute for three years, but was released on parole after serving eleven months. At eighteen, he was convicted of DWI and was arrested for simple battery and simple trespass. Those charges were nolle prossed when no prosecution witnesses appeared at trial. At nineteen, he pleaded guilty to unauthorized use of an access card and was placed on three year's probation.
During 1999, at age twenty, he was charged, among other things, with possession of marijuana and possession of drug paraphernalia, simple criminal damage to property, simple battery of his father, resisting an officer, second-offense DWI, flight from an officer, speeding, simple assault on a police officer, simple battery and simple assault on a woman, and seconddegree kidnapping. He was able to have many of the charges nolle prossed or reduced, but he pleaded guilty to the drug charge and to false imprisonment (to which the second-degree kidnapping charge had been reduced). He again received suspended sentences and probation.
The culmination of his criminal activity came on August 5, 1999, when he was involved in an altercation with TLM, who was seven months pregnant, in which he allegedly struck her in the head numerous times, threw her clothing from his car, and tried to back over her with the car when she tried to pick up the clothing he had thrown in the roadway. He was initially arrested on a fugitive warrant from Jefferson Parish for failure to appear, and then was charged with attempted manslaughter of TLM, attempted first-degree feticide of the child whose adoption he is now opposing, simple battery, and simple possession of marijuana. The guilty pleas for false imprisonment and drug possession resulted in revocation of his probation. At the time of the trial in the instant case, he was awaiting trial on the charges arising from the August 5, 1999 incident.
After ACM's incarceration, TLM and Blaze continued to live with ACM's parents. She testified, "Nobody told me to go, so I just stayed." When she went into labor, ACM's family took her to the hospital. Photographs introduced at trial show ACM's father holding TLM's hand and holding EHM just after the baby was born. A month after EHM was born, ACM's sister had a baby. TLM testified that after that, ACM's family members never held EHM or paid much attention to him. On December 26, 1999, when EHM was not quite two months old, TLM and *401 one of ACM's sisters got into a "bad argument." TLM left the home and moved in with her mother. She stated she could not stay with ACM's family any more because of the anger between her and them. She believed they hated her, and she did not want their hatred transferred to the baby. She had not spoken to ACM's family since she left, except when ACM's mother told her to come get her baby things from the house or she would give them to the Salvation Army. She testified ACM's family came to her mother's house about six weeks later to drop off some of the baby items and did not even ask to see the baby.
ACM first saw EHM during his sentencing hearing when TLM brought the baby to court. During the two months she lived with ACM's family after EHM was born, his family took her and the baby to visit ACM in prison. She testified he had seen the baby on prison visits four or five times, but he was able to hold the baby on only the last three visits. She stated he interacted well with the baby on those visits. ACM testified he had seen the baby at least ten times while he was incarcerated, and he was able to hold the baby on most of those visits.
After he went to jail, ACM proposed to TLM. He told her he wanted to marry her and build a life for her and the baby. She thought the proposal was a joke. He wrote to her approximately four times a week while he was in jail. She wrote back to ACM and told him over and over that she could not take care of the baby. ACM testified that when he received her letter saying she was going to surrender the baby for adoption, he did not take it seriously; he thought she was just mad at him and would change her mind.
TLM stated she did not offer the baby to ACM's family to adopt because his family was not getting along, they already had his sister's baby to care for, she did not want to burden them, and she thought they hated her. She said that before EHM was born, she and ACM got into an argument about giving up the baby for adoption. He told her that was fine with him as long as he got half the money she received for surrendering the baby. At trial, he denied that they had ever had such a discussion. He testified, however, that he was convinced TLM had received money for the surrender, even though she denied it. TLM stated that ACM's mother overheard the argument and said she would find someone at church to take the baby.
TLM gave the following poignant explanation of her decision to surrender EHM for adoption: "I wanted my child to have everything that I had never had. And [ACM] was in jail so he couldn't help me. I didn't want to put that stress on my momma. So I wrote [ACM] and told him, you know, that I wanted to give up [EHM] because I wanted [him] to have the world and to be able to have an education, something that I never had." She further stated, "I wanted to see my baby have an education, not a mean and a violent home.... I wanted him to have a life."
On appeal, ACM contends Children's Code article 1138 is unconstitutional. He raises three alleged evidentiary errors and also alleges the trial court was manifestly erroneous in finding he was an unfit parent and denying his claim for parental rights.

CONSTITUTIONAL ISSUE
ACM raises in brief, for the first time, the constitutionality of Children's Code article 1138 on the basis that unwed fathers are treated differently from unwed mothers under the law. The constitutionality of a statute must first be questioned in the trial court. It must be specially pleaded with particularized grounds, and *402 the issue must receive a contradictory hearing. Vallo v. Gayle Oil Company, Inc., 94-1238, p. 8 (La.11/30/94), 646 So.2d 859, 864-865; Succession of Barthel, 99-1573, p. 8 (La.App. 1 Cir. 6/23/00), 762 So.2d 740, 745-746, writ denied, 00-2235 (La.10/27/00), 772 So.2d 652. Unless this court's jurisdiction is affected, we cannot raise the constitutionality of a statute on our own motion. State v. Brewster, 00-1266, p. 3 (La.6/30/00), 764 So.2d 945, 946. As this matter was not raised in the court below, we are unable to address it on appeal.[5]

EVIDENTIARY ISSUES
A trial court judgment that is tainted by evidentiary errors may not be entitled to a deferential standard of review. We first address the evidentiary issues. See Buckbee v. United Gas Pipe Line Company Inc., 561 So.2d 76, 86-87 (La. 1990).

Evidence of relationship between TLM and AMC's family
ACM contends the trial court erred in excluding testimony about ACM's father serving as TLM's birth coach. He contends this evidence was relevant to show the depth of emotional commitment of ACM's family to TLM and EHM. These contentions are without merit for two reasons. First, ACM had the burden of showing his own commitment to his parental responsibilities, not the commitment of his family. Second, the involvement of ACM's family in the birth process was amply demonstrated through TLM's testimony that they were with her when the baby was born and the photographs showing ACM's father holding TLM's hand in the birthing room and various members of ACM's family holding the newborn baby.
ACM also contends the trial court erred in excluding testimony regarding TLM sending out birth announcements on which her last name was the same as ACM's, which he contends showed her "understanding of the depth of her relationship and commitment with" ACM. The trial court sustained a relevancy objection to this line of questioning because TLM testified she did not send out birth announcements. The trial court did not err in barring ACM's counsel from questioning TLM about the name used on birth announcements which she denied existed.

Prior inconsistent statement
ACM contends the trial court erred in refusing to allow him to introduce a statement TLM made to the St. Tammany Parish District Attorney's Office. He contends the statement refuted a previous statement she gave on August 5, 1999, when ACM was arrested for attempted manslaughter and attempted feticide.
Louisiana Code of Evidence article 103 provides in pertinent part: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and... [w]hen the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel." AMC contends he made the substance of the evidence known to the court. He did not, however, proffer the statement or summarize the contents of the statement for the record. We have no way of knowing what TLM said in the statement, *403 which makes it impossible for us to review this issue on appeal.

Police reports
ACM contends the trial court erred in admitting the police reports of ACM's arrests of May 27, 1999, and August 5, 1999, citing Code of Evidence article 803(8)(b)(i), which provides that investigative reports by police and other law enforcement personnel are not subject to the public records exception to the hearsay rule.
The May 27 arrest was for speeding, second-offense DWI, resisting an officer, and simple assault on an officer. Deputy Doug Sharp, who prepared that arrest report, testified at trial regarding that incident. He testified independently of the written report and did not recall many of the details. When it was offered into evidence, ACM objected. The trial court initially stated, "My idea is that he's the best evidence right there. You've got him. See, I don't know what's in that report.... I don't know what else it contains." But then the trial court reversed itself, stating, "Well, if it all relates to this arrest ... I'll allow it to be marked, filed, and made part of the record.... And then I ... will judge how much of it should be considered."
This police report went far beyond Deputy Sharp's testimony and should not have been admitted into evidence. We note, however, that this was a bench trial, that the trial court admitted the police report with the understanding that he would examine it judiciously before considering it in making a decision, and that nothing from this police report is referred to in the trial court's extensive reasons for judgment. The filing of this police record into evidence did not prejudice substantial rights of ACM or affect the final outcome of the case. In reasons for judgment, the trial court made no reference to any matters contained in the arrest reports; the trial court apparently did not consider the matters contained in the report. Thus, any error in admitting it was harmless. See Buckbee, 561 So.2d at 85.
The second police record introduced into evidence was Deputy Jack Admire's report of the August 5, 1999, incident. Counsel questioned Deputy Admire extensively, using the report. When counsel for the adoptive parents offered the police record, ACM failed to object. Error may not be predicated on a ruling that admits evidence if a timely objection stating specific grounds is not made. LSA-C.E. 103(A)(1). Thus, ACM has failed to preserve for appeal his objection to admission of the August 5, 1999, police report.

ACM'S LACK OF FITNESS AS A PARENT AND DENIAL OF HIS PARENTAL RIGHTS
To establish parental rights, an unwed father must acknowledge that he is the father of the child.[6] He must also prove that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child. LSA-Ch.C. art. 1138(A). The trial court found that except to the extent ACM established himself as the biological father of EHM, he had met none of the criteria of Article 1138(A). ACM contends the trial court manifestly erred in declaring him an unfit parent, denying his claim for parental rights, and dismissing his opposition to the adoption.
*404 Explanation of how a father proves his substantial commitment is outlined in Article 1138(B) which sets forth the unwed father's burden of proof:
Proof of the father's substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:
(1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
"Parental fitness" is defined in Children's Code article 1103(5):
"Parental fitness" means:
(a) That a parent has not abused the child....
(b) That a parent has consistently offered to provide reasonably necessary food, clothing, appropriate shelter, or treatment for the child...
(c) That a parent suffers from no medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency which makes him unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
(d) Viewed in its entirety, the parent's past or present conduct, including his criminal convictions, would not pose a risk of substantial harm to the physical, mental, or emotional health of the child.
The testimony of ACM and TLM differed on many of the key facts. The trial court specifically found that TLM was "a sincere and credible witness, whose concerns were properly focused on the best interests of her child." By implication, he found ACM was not a credible witness. In manifest error review, it is important that the appellate court not substitute its opinion for that of the juvenile court which is in the unique position to see and hear the witnesses as they testify. The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record. In re A.J.F., 00-0948, p. 26 (La.6/30/00), 764 So.2d 47, 62.
The trial court, in finding ACM an unfit parent who had made no substantial commitment to TLM or EHM, stated:
While [ACM] now states that he is willing to provide support and visit the child, the evidence and testimony clearly show that he has shown little to no commitment to this baby and his mother prior to the baby's birth. He failed to maintain employment, he continued to abuse drugs and alcohol, which resulted in numerous arrests. He was physically and emotionally abusive to [TLM] and others during the pregnancy. He provided her no financial support during her pregnancy even though he claims he was earning $1200 per month. Instead, he relied on his family and public assistance to provide her the necessary support.

*405 It is only now, after his incarceration, that he has expressed a change of life. His words are simply not enough. The statute requires that [ACM] make a good faith effort to provide [TLM] with consistent financial support during the entirety of her pregnancy. Although [ACM] states he is willing to support and visit the child, the law requires he not only be willing, but be able to assume legal and physical care of the child. That is because the statute mandates the court automatically place the child in the father's custody upon the rendering a judgment granting the opposition. La. Ch.Code Article 1138 E. In light of his current incarceration and anticipated probation and parole requirements, it is clear he is unable to assume legal and physical care of the child and cannot meet this criteria.
The final requirement of parental fitness requires close scrutiny of [ACM's] history. Since the age of 15, [ACM] has had continuous problems with the law, drugs, alcohol, and violence. Although his evaluators conclude his mental and emotional problems are the result of the stress of his incarceration and the adoption issues, and are not likely to persist after his release from jail, this court does not agree. His past medical and criminal history, includes suicide and homicidal threats, and violent rages toward [TLM](while she was pregnant) and his family members. The evidence, medical records, and mental evaluations establish that [ACM] suffers from emotional and substance abuse problems and that he has shown no willingness, except in connection with this hearing, to adequately seek treatment. Not only has he failed to seek treatment for his substance abuse and aggressive behavior, he continues to deny he has problems with them.
Whether [ACM's] actions in physically abusing [TLM] amount [to] physical abuse of the child need not be addressed, because [ACM] has not met the other factors necessary to establish his parental fitness. ACM has never held a steady job and never provided reasonably necessary food, clothing and appropriate shelter or treatment for his unborn child. Instead, he relied on public assistance and his family to provide support. He is now incarcerated and is unable to provide for the child's basic needs, much less provide a permanent home.
Finally, the court after reviewing the entire record in this matter and particularly [ACM's] past and present conduct, including his criminal convictions, is not convinced that he will not pose a substantial risk of harm to the physical, mental and emotional health of this child.
ACM contends the trial court was clearly wrong based on ACM's version of the facts, a version that is contradicted not only by TLM's testimony, but in part by the testimony of his own father. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. In re A.J.F., 00-0948 at 25, 764 So.2d at 61.
The trial court's findings are amply supported by the evidence. During TLM's pregnancy, ACM chose a lifestyle that demonstrated his lack of commitment to TLM and the unborn child. Although he was on probation, he continued to abuse drugs and alcohol and commit criminal acts, which led to the revocation of his probation. TLM testified ACM was abusive to her "[p]hysically, mentally, and emotionally." He pulled her by the hair, punched her in the arm and legs, and told her he wished she would die in childbirth *406 or contract AIDS. She stated that while she was pregnant, his behavior became worse and worse.
TLM and ACM's father both testified that ACM was often away from home from Friday to Sunday, going to clubs and partying with his friends. ACM boasted to TLM that he had had sex with other women while she was pregnant. On May 30, 1999, he attacked TLM while she was four months pregnant. According to TLM, he tore off her clothes, called her obscene names, threw her clothes outside, shoved her into a chair, spraining her ankle so badly she needed a cast, and was about to kick her in the stomach as she crawled down the hall naked when his father jumped on him and restrained him. His mother called the police. On August 5, 1999, when she was seven months pregnant, he poked her in the head and eyes and tried to back over her with the car.
Furthermore, before he was incarcerated, he made no effort to provide financial support for TLM or the unborn baby. ACM was working for his father and uncle, and they allowed him to work as he pleased. TLM testified that if he had a hangover, he would stay in bed instead of going to work. Even with his sporadic work habits, he testified he made $1,200 per month. That money was not saved or spent for the upcoming expenses of fatherhood, however, even though he was living with his parents and paying nothing for room and board.
Dr. Bobet testified alcohol and drugs cause ACM to become enraged easily. When she examined him, he was "sober due to being incarcerated." She felt he was sincere about wanting to set his life on a different path when he is released from jail, but she could not predict what would happen in the future. She could not recommend that he parent if he did not go into a three- to nine-month inpatient substance abuse treatment program when he is released from jail. Although at trial he stated he was committed to getting the help he needed because he had learned that "life is more than drugs and alcohol and jail," he made no effort to get into the substance abuse treatment program available to him while he was incarcerated.
ACM testified he is scheduled for release, with good time, on February 2, 2001. Upon his release, he plans to enter an inpatient substance abuse treatment program as recommended by Dr. Bobet. If he gets into no disciplinary trouble while in jail and is released on February 2, 2001, it could be almost a year from now before he completes the inpatient treatment. Furthermore, we note that the attempted manslaughter and attempted feticide charges are still pending against him.[7] If convicted on those counts, he could be returned to jail.
ACM contends that his incarceration prevents him from complying with the burden established in Article 1138. However, prior to his incarceration, he was aware of TLM's pregnancy, the impending birth of his child, and the fact that he was on probation. Despite this awareness, he refused to alter his inappropriate and criminal behavior.
It was his actions, his refusal to get help for his substance abuse problems, his refusal to give up an irresponsible lifestyle, and his engaging in illegal activity which led to his incarceration. His incarceration *407 was directly related to his behavior which occurred at a time when he knew fatherhood was imminent. Substantial unacceptable behavior was directed specifically toward TLM while she carried his child. Thus, it was not his incarceration but rather his behavior which prevented him from complying with the burden established in Article 1138.
Based on our thorough review of the record, we find no manifest error in the trial court's findings that ACM failed to provide financial support, food, clothing, shelter, or treatment for EHM, either before or after the child's birth, that he is unable to provide an adequate permanent home for the child now or in the reasonably near future, and that, based on his past conduct, including criminal convictions for violent crimes, he could pose a risk of substantial harm to the child. We thus affirm the judgment of the trial court. Costs of appeal are assessed to ACM.
AFFIRMED.
NOTES
[1] Although ACM did not formally acknowledge the child, the parties stipulated that DNA testing showed a 99.996% likelihood that ACM was the father of EHM.
[2] MM Intervened in the suit, but the court dismissed the intervention as premature.
[3] While the judgment states ACM's parental rights are terminated, ACM actually had no parental rights. This action, brought under Children's Code article 1138, sought to establish his parental rights.
[4] She testified she had been raped when she was younger and had resulting emotional problems that prevented her from working.
[5] We note Justice Victory's expression of concern regarding Article 1138 because of the "equal protection issue it raises by demanding proof of fitness of an unwed father and not from an unwed mother." See In re A.J.F., 00-0948, p. 1 (La.6/30/00), 764 So.2d 47, 62. For further discussion of this issue, see ADOPTION LAW AND PRACTICE, § 2.04(2) at 2-27 (Joan Heifetz Hollinger ed., Matthew Bender 1998).
[6] Although ACM never formally acknowledged EHM, the trial court found that "he met this burden through the DNA testing and his action to oppose the adoption." This finding is not at issue on appeal.
[7] There was some dispute in the record as to whether these charges had been reduced. The trial court allowed the record to be supplemented regarding the current status of these charges. However, there is nothing in the record to substantiate the charges have been reduced.