808 So.2d 491 (2001)
In re the Placement for ADOPTION OF J.L.G.
No. 2001 CJ 0269.
Court of Appeal of Louisiana, First Circuit.
February 21, 2001.
*493 Anna E. Dow, Baton Rouge, for First Appellant, the minor child, JLG.
V. Charles Cusimano, Baton Rouge, for Second Appellant, Catholic Community Services.
Dede Sabagh Ferrara, Walker, for Appellee, TJT, biological father of JLG.
Before: CARTER, C.J., FOIL, and WEIMER, JJ.
CARTER, C.J.
MLG gave birth to JLG on June 30, 2000. On July 6, 2000, MLG executed a voluntary act of surrender for adoption, surrendering her daughter to Catholic Community Services (CCS). The child's father, TJT, opposed the adoption. After a hearing, the trial court dissolved the surrender to CCS, granted legal custody to TJT, and declared that no adoption could be granted without TJT's consent. CCS and the child, through the attorney appointed to represent her, appeal.
In Lehr v. Robertson, 463 U.S. 248, 261-262, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983), the Supreme Court held that an unwed father who "demonstrates a full commitment to the responsibilities of parenthood" and "grasps that opportunity and accepts some measure of responsibility for the child's future" acquires substantial protection under the Due Process Clause of the United States Constitution. A mere biological link is insufficient; that link must be combined with a substantial parent-child relationship. In Adoption of B.G.S., 556 So.2d 545, 550 (La.1990), the Louisiana Supreme Court explained, "[T]he mere existence of a biological link and fitness will not sustain the father's interest; it is defeasible if not preserved by dedicated, opportune fatherly action."
Our supreme court stated in B.G.S.: "Adoption in Louisiana is a creature of statute, and the ultimate responsibility for establishing the necessary procedures to effect adoptions belongs to the Legislature." 556 So.2d at 556. The Louisiana legislature has codified in Children's Code article 1138(A) the requirements for an unwed father to establish his parental rights. He must acknowledge that he is the father, prove that he has manifested a substantial commitment to his parental responsibilities, and prove that he is a fit parent of his child. The legislature has further delineated the requirements to prove substantial commitment and fitness. Article 1138(B) sets forth three elements that must be proven: 1) support; 2) visitation; and 3) ability to care for the child:
Proof of the father's substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:
(1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing *494 and able to assume legal and physical care of the child.
"Parental fitness" is defined in Children's Code article 1103(5):
"Parental fitness" means:
(a) That a parent has not abused the child....
(b) That a parent has consistently offered to provide reasonably necessary food, clothing, appropriate shelter, or treatment for the child....
(c) That a parent suffers from no medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency which makes him unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
(d) Viewed in its entirety, the parent's past or present conduct, including his criminal convictions, would not pose a risk of substantial harm to the physical, mental, or emotional health of the child.
CCS and JLG contend the trial court was manifestly erroneous in finding TJT had established his parental rights. They contend he failed to prove a substantial commitment to his parental responsibilities and failed to prove his fitness to parent.[1]

TJT'S COMMITMENT TO PARENTAL RESPONSIBILITIES
The trial court found that "in accordance with his means and knowledge" TJT had provided support for the child, visited the child, and is now willing and able to assume legal and physical care of the child. The court further stated that TJT's actions in formally opposing the adoption were "Constitutionally sufficient to establish a dedication to parental responsibilities." Although the parties did not raise the constitutionality of article 1138 in the court below, the trial court found that article 1138 "may run afoul of constitutional protections" if it is read "to restrict or delimit a father's liberty interest in a relationship with his child." The court then concluded that TJT had "sufficiently demonstrated by his acts a full commitment to the responsibilities of parenthood by coming forward, fully and continual[ly] expressing his desire to rear his child and accept responsibility for the child's future."
An unwed father must do more than simply come forward and express his desire to rear his child. The United States Supreme Court found in Lehr that an unwed father must demonstrate a full commitment to the responsibilities of parenthood and accept some measure of responsibility for the child's future. The trial court found TJT had done this by proving support, visitation, and ability to care for the child as required in article 1138(B). JLG and CCS contends these findings are manifestly erroneous.

A. Support
Although the trial court found TJT provided support for the child, we find no evidence in the record to justify this finding. It is undisputed that TJT provided no financial support to MLG while she was pregnant, paid no medical expenses for MLG or JLG, and provided no cash, diapers, formula, or items for JLG after she was born. At most, he and his mother provided four clothing outfits and a rattle. *495 In oral reasons, the trial court stated: "There were questions asked as to whether or not [TJT] offered any money to care for the child since the child's birth. The answer to that was no. Even though he could."
TJT knew he could have made contributions to the child's support through CCS, but he stated that if a child was not going to be a part of his life, he was not going to support the child. His excuse for not paying any of MLG's medical expenses during her pregnancy was that he did not know her whereabouts or how to contact her. However, he was in contact with MLG for visitation with their son until March 2000, or about five months into her pregnancy.
TJT argues in brief that MLG never requested support from him. Article 1138 does not refer to providing support "if requested." A father who is committed to his parental responsibilities will offer support to his child without being asked. Furthermore, MLG testified she did not ask him for support because to have done so would have been a vain and useless act: "I didn't ask him for that because I knew he wasn't going to give it to me."

B. Visitation
The trial court found TJT visited the child. Article 1138(B)(1), however, requires the father to "frequently and consistently" visit the child after birth to show substantial commitment. TJT has visited JLG three times since her birth. A case worker with CCS informed TJT of JLG's birth and arranged for a visit on July 5, five days after her birth. TJT did not show up for the visit. He testified he got called out of town to work, so his mother went to see the baby instead of him. Carla Wilburn, a maternity case worker with CCS, testified she arranged two visits for him in July and one in August. On each of those visits he was accompanied by other family members. At the time of the hearing in November 2000, he had not seen JLG since the August visit.
TJT explained that his visits had been limited because he had "been busy" and had been working. He stated he worked during the office hours of CCS. Wilburn testified visits outside of office hours could have been arranged if TJT had requested them, but he stated he did not know that was possible. When the trial judge asked him why he did not inquire about afterhours or weekend visits, he did not reply. Despite Wilburn's testimony that afterhours and weekend visits were available, the judge analogized scheduling an afterhours visit to attempting to schedule a court hearing outside office hours. The judge stated that if one made such a request, "it's likely that's not going to happen." The judge thus concluded she would not "charge that too much against" TJT that he did not inquire into visits that would fit in with his work schedule.

C. Ability to care for the child
The trial court further found TJT was willing and able to assume physical and legal care of JLG. The only factor the trial court examined was whether he was employed. TJT testified that he has worked for Brand Scaffold since 1993 (when he was not laid off or in jail). There was no evidence regarding his rate of pay or the number of hours he worked. We note that on the form for a drug screen administered on the date of the hearing, TJT stated he was unable to pay the $20 fee. Because he testified he had a job, however, the trial court found he could care for the child.
TJT is 24 years old. He lives with his mother, DG. Despite the fact that TJT works, DG testified he contributes nothing to the household expenses. His driver's license is suspended because of a conviction *496 for driving while intoxicated and a traffic ticket from January 2000 that he failed to pay. His most recent incarceration was in September 2000; he served two and one-half weeks in jail for driving while intoxicated. He currently has charges pending against him for disturbing the peace by public intoxication in June 2000 and a 1995 arrest for driving while intoxicated.
DG stated she is willing to let TJT live with her until he gets back on his feet and to care for the baby while he works. She has cared for her other son's children and has baby furniture at her home. DG testified TJT plays with and reads to his nieces and nephew. TJT stated he had cared for his son while DG was at work, but he had never taken care of a child by himself for more than a few hours.

TJT's FITNESS TO PARENT
JLG and CCS contend the trial court erred in finding TJT had proven he was a fit parent. As the trial court noted in her oral reasons, there is quite a bit of testimony in the record regarding the "life and escapades" of TJT and MLG. TJT described himself as having a "shady past." TJT testified he dropped out of school in eighth grade. His parents were getting divorced, and he lived with his grandmother for six months. After that, he was on his own. At some point he earned a graduate equivalency diploma.
He was hospitalized at Parkland Hospital in Baton Rouge in 1991, when he was fourteen or fifteen years old, for depression. He testified he currently takes a prescription drug to correct a chemical imbalance. He stated it "helps stabilize [his] highs and [his] lows."
TJT has a history of drug and alcohol abuse. He admitted smoking marijuana and taking LSD, cocaine, and ecstasy. MLG testified she had seen him "do coke, LSD, crack, crank." She further stated that while they lived together, he drank daily until he passed out, usually drinking at least a six-pack of beer. She testified that when he was drunk, he was "out of the box ... crazy, nuts, freak[ing] out."
TJT described himself as a recovering alcoholic. He joined Alcoholics Anonymous in May 2000, five months before the hearing. He testified he no longer drinks alcohol and stated, "I don't do drugs any more." When questioned about his arrest for public intoxication in June 2000, he stated he had not drunk since that incident, explaining, "everybody slips." When screened for drugs on the date of the hearing, he testified positive for cocaine.
Before he met MLG in 1998, TJT was convicted of second-degree-battery. The battery charge arose from an incident in which TJT testified he was simply protecting the victim's wife from a beating. He "head-butted" the victim. According to MLG, TJT told her the victim "flat-lined" twice while the paramedics were administering first aid and was in a coma for two weeks. He also pleaded guilty in 1998 to two counts of battery on a police officer. He could not remember the details of those charges at trial, stating, "I was probably drunk."
Shortly after TJT was released on probation on the second-degree-battery charge, he met MLG. She was 18 and he was 21. After a week, they began having sex. After approximately four months, MLG was pregnant. But on the day she found out she was pregnant, TJT began serving a sentence for burglary and revocation of his probation on the battery charge. Shortly thereafter, MLG moved in with TJT's mother.
The burglary charge arose from his attempt to get beer from a convenience store. He testified he was very drunk and wanted more beer. He broke the glass *497 door on the front of a convenience store with a pair of pliers and went inside to get the beer.
TJT served ten months in jail for the burglary and was released a few weeks after his first child, CG, was born. He moved back into his mother's home, where MLG was living with the baby. After a few weeks, however, they got into a fight. He had been drinking all weekend. When he stomped on her foot, her sister threw a baby swing at him. MLG testified TJT then threw her out a carport door, but she ran back inside and locked him out. He then attempted to get inside by head-butting the door. She called the police but did not press charges. She also testified that one other time he became angry with her and began "screaming and yelling and tossing [her] around like a rag doll." She described another violent incident where she saw him head-butt a total stranger and argue and fight in the parking lot of a convenience store.
The week that TJT stomped on her foot, MLG moved to her father's home in Arkansas. TJT was in constant contact with her while she was in Arkansas, and finally he came to Arkansas and moved her back to Baton Rouge. She lived with her mother for two days and then moved in with TJT in a rental house. In October 1999, she found out she was pregnant again.
A month later, TJT was shot. She left TJT while he was in the hospital and moved in with her mother because she did not believe his version of how he had been shot, and he had "repeatedly lied to [her] before." This was his second gunshot wound. The first time, he was eighteen years old and was shot in a street fight.
TJT has had some very unpleasant incidents with drug dealers. MLG testified she had seen him running home with stolen drugs. He testified he had been beaten by drug dealers in the past for trying to steal their cocaine. In one incident, he stole from a drug dealer, felt contrite later, and went back to apologize. The drug dealer beat him severely. He did not want to go to a hospital, so MLG sewed up the gash in his head with a needle and thread.
In another incident, TJT shoplifted a bottle of vodka from a grocery store and attempted to trade it to a drug dealer for a rock of crack. He made the trade with the drug dealer, but the dealer tricked him and gave him a piece of plastic. So, he went back to the same grocery store and attempted to steal another bottle of vodka. This time he was apprehended by store security, however. According to MLG, he spent that night in jail.
After MLG left TJT in November 1999, she lived with her mother. TJT had regular visits with his son CG until February or March 2000. He did not provide any financial support for CG but stated he would bring clothing or food when he came for visitation. MLG testified he had provided only four clothing outfits, a stuffed animal, and safety latches for the cabinets. He stated he did not intend to pay child support unless he was ordered to do so by a court.
The testimony of MLG and TJT differ on why TJT's visitation with CG stopped in March 2000. She testified he called her and wanted to keep CG over the weekend at DG's home, but MLG refused. She stated she did not trust DG, and she felt TJT was too unpredictable to leave CG alone with him. She said her refusal made TJT mad, and he did not contact her again about visitation.
TJT, on the other hand, testified visitation stopped because MLG and her mother moved to Prairieville. He testified he did not have MLG's telephone number and did not know how to contact her. MLG testified, however, that her mother's cell phone number was the same in Prairieville as it was in Baton Rouge.
*498 When she was about four months pregnant, MLG decided to surrender the baby for adoption. TJT testified her decision coincided with his announcing his engagement. TJT told MLG he opposed the adoption. He also made his opposition known to Wilburn. TJT testified he is committed to taking care of JLG and wants to do so because she is his flesh and blood and he loves her. He wants to be able to give her the things she needs. He got married some time before JLG was born, but he testified he is "not exactly sure what is going on" with his wife now. She could not pay the bills while he was in jail, so she moved in with her mother. After he got out of jail, she continued to live with her mother. He testified he never planned for his wife to be involved with JLG, but there "is room for her" if she wants to be.
MLG stated that surrendering the baby was the hardest thing she has ever done. She knew she could not give the baby what she needed, a stable home with two parents who love her. She wants her child to have a "good father, an honorable father, a man who lives to be a good member of society." She believes it is better for JLG not to be around TJT with his violence, drinking, illegal drug use, and poor judgment.
She stated DG had mentioned the possibility of adopting JLG, but MLG in no way approves of that idea. She testified DG has a short fuse and believes in corporal punishment. As further reason, she pointed to the way DG had reared TJT. She was also afraid that DG would convince the child that MLG was "the devil or something."

REVIEW OF THE TRIAL COURT'S FINDINGS
A court of appeal may not set aside a trial court's findings of fact in the absence of manifest error, which in its simplest terms means "clearly wrong." Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Substantial commitment and parental fitness are factual findings that are entitled to deference unless the trial court is clearly wrong. Ex rel. E.C.B., 29,725, p. 4 (La.App.2d Cir.1/29/97), 691 So.2d 687, 690, writ denied, 97-0307 (La.1/31/97), 687 So.2d 394. In In re A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47, our supreme court reversed an appellate court that had substituted its judgment for the juvenile court when the "criteria of parental fitness and substantial commitment to parental responsibilities ... [were] vigorously contested and the facts surrounding each [were] disputed in their entirety." 00-0948 at 25, 764 So.2d at 61.
Children's Code article 1138 is clear that the unwed father has the burden of proof. Article 1138(A) states: "At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights *499 by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child." (Emphasis added.) Despite the explicit language of article 1138(A), the trial court stated: "[T]hat burden of proof, that [TJT] is unfit is really upon [CCS] or in a companion situation with the attorney for the child, to show that her parent is unfit, and is unable to parent her." This was clear legal error by the trial court, but neither appellant raised this as an assignment of error.
Under the facts of this particular case, however, it makes no difference as to whether we apply the manifest-error or legal-error standard because under either standard of review, the end result is the same. This is not a case like AJF, where the facts were vigorously disputed. The material facts in this case are undisputed. Our review of those facts reveals the trial court was clearly wrong in finding TJT had proven a substantial commitment to parenting when there was no evidence in the record that he had provided meaningful financial support or had visited the child frequently and consistently. The court was also clearly wrong in finding he was a fit parent who was willing and able to provide physical and legal care for the child. Thus, under either standard of review, we must conduct a de novo review of the entire record and render a judgment on the merits. Rosell, 549 So.2d at 844; Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
TJT offered no support to MLG during her pregnancy. His financial support of JLG was limited to providing four outfits and a rattle, even though the trial court found he had the means to provide support. His three visits to JLG in four months certainly cannot be considered frequent and consistent. And the fact that he has a job of some sort and a baby bed in his room at his mother's house is not sufficient to create a permissible view that he is able to assume legal and physical care for an eight-month-old child. There are pending criminal charges against him. He offered no testimony on what would become of JLG if he returns to jail. The positive drug screen on the day of the hearing shows he is still using illegal drugs. And the fact that he was so "busy" he could not make time to visit JLG from August to November does not bode well for his being able to care for her full-time.
Furthermore, review of the record convinces us that TJT is a not a fit parent within the meaning of Children's Code article 1103(5). The trial court placed great weight on the fact that TJT had never abused a child. That, however, is only one of the four criteria of article 1103(5). He has not consistently offered to provide reasonably necessary food, clothing, shelter or treatment for JLG. His established pattern of behavior and past and present conductdrug abuse, alcohol abuse, association with drug dealers, violent temper, criminal acts, and use of poor judgment demonstrate a risk of substantial harm to JLG's physical, mental, and emotional health. TJT testified he loves his child and is committed to caring for her. Despite his professed good intentions, however, his chemical dependency is such that while this opposition was pending, he was arrested for public intoxication and on the date of the hearing tested positive for cocaine. His past history of providing virtually no support for his other child amply demonstrates what can be expected of him in the future.
TJT argues that his mother is supportive of him caring for JLG and that we should consider her support. We note that in In re Adoption of EHM, 00-2705 (La.App. 1st Cir.12/15/00), p. 7, 808 So.2d *500 397, 402 we stated that the father "has the burden of showing his own commitment to his parental responsibilities, not the commitment of his family." TJT relies on language in E.C.B. in which the Second Circuit noted the 18-year-old unwed father's family was ready and able to support him in rearing his child and stated the family members should be commended for their efforts to assist him. In that case, however, the family support was only one factor the court considered. The court stated that "there was no evidence whatsoever to show that [the unwed father in E.C.B.] was unfit for parental responsibilities." 29,725 at 6, 691 So.2d at 691. He had also made specific plans for caring for his daughter so that he could work to help support her and still have time to be a good father. E.C.B. is quite a contrast to this case, where there record is replete with evidence of TJT's unfitness, and there was no explanation of how TJT could support his child when he was not even contributing to his mother's household expenses while living with her.
Considering the foregoing, the judgment of the trial court must be reversed, and judgment is rendered declaring that TJT's parental rights are terminated. We hereby order that JLG be returned to the physical and legal custody of CCS. All costs are assessed to TJT.
REVERSED AND RENDERED.
NOTES
[1] They do not dispute that he met the first requirement, to acknowledge the child. TJT never formally acknowledged his daughter, but Carla Wilburn, a maternity case worker with CCS, testified a DNA test was performed. The results were not entered into evidence, but apparently TJT does not dispute that JLG is his child.