STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

06-1226


JOHN AND JANE DOE, PROSPECTIVE ADOPTIVE
PARENTS OF BABY DOUCET

VERSUS

A.B., NATURAL FATHER OF BABY DOUCET


\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, SURRENDER #176
HONORABLE GUY E. BRADBERRY, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

GLENN B. GREMILLION
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Glenn B. Gremillion, and Billy Howard Ezell, Judges.


REVERSED AND RENDERED.


Michael R. Garber
1801 Ryan Street
Lake Charles, LA 70601
(337) 494-5500
Counsel for Plaintiffs/Appellants:
    John and Jane Doe,
    Prospective Adoptive Parents

**Sidney Joseph Rosteet**
**P. O. Box 2719**
**Sulphur, LA 70664**
**(337) 528-3014**
**Counsel for Plaintiffs/Appellants:**
       **John and Jane Doe,**
       **Prospective Adoptive Parents**

**Edward M. Nichols  Jr.**
**827 Pujo Street**
**Lake Charles, LA 70601**
**(337) 439-8587**
**Counsel for Defendant/Appellee:**
       **A. B.**

**Todd Holman Melton**
**616 Kirby Street**
**Lake Charles, LA 70601**
**(337) 439-2979**
**Counsel for Appellee:**
       **Baby Doucet**

GREMILLION, Judge.

The plaintiffs, John and Jane Doe, the prospective parents of Baby D,
appeal the judgment of the trial court in favor of A.B., the natural father of Baby D.
For the following reasons, we reverse and render.

## FACTUAL AND PROCEDURAL BACKGROUND

Baby D was born November 3, 2005. Prior to her birth, her biological
mother, C.D., who was seventeen years old, decided to put her up for adoption and
a private adoption was arranged with the Does. On August 25, 2005, C.D. executed
a Notice of Intent to Surrender a Child for Adoption. The notice was served on A.B.
on September 8, 2005, and he filed an objection to the adoption. A hearing on the
opposition was held on January 9, 2006. The trial court upheld A.B.'s objection and
held that the adoption could not go forward without A.B.'s consent. Judgment was
signed July 11, 2006, and the Does now appeal assigning as error the trial court's
grant of A.B.'s opposition to the adoption on the ground that he was thwarted in his
efforts to assume legal and physical care of the child. The Does claim that the trial
court did this without considering rebuttal evidence that established that he did
nothing to manifest a commitment to his parental responsibilities and that it is in the
best interests of the child to terminate his parental rights and allow the adoption.

## DISCUSSION

Louisiana Children's Code Article 1138 applies in this case and states
(emphasis added):

> A. At the hearing of the opposition, the alleged or adjudicated
> father must establish his parental rights by acknowledging that he is the
> father of the child and by proving that he *has manifested a substantial
> commitment to his parental responsibilities and that he is a fit parent of*

1

*his child.*

B. Proof of the father's substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:

(1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.

(2) *Was willing to provide such support* and to visit the child and that he has made reasonable attempts to manifest such a parental commitment, *but was thwarted* in his efforts by the mother or her agents, and *that he is now willing and able to assume legal and physical care of the child.*

C. The child, the mother of the child, and the legal custodian may offer rebuttal evidence limited to the issues enumerated in Paragraphs A and B of this Article. *However, the primary consideration shall be, and the court shall accept evidence concerning, the best interests of the child.*

D. If the court finds that the alleged or adjudicated father has failed to establish his parental rights, it shall decree that his rights are terminated.

E. If the court finds that the alleged or adjudicated father has established his parental rights, the court shall declare that no adoption may be granted without his consent. The court may also order the alleged or adjudicated father to reimburse the department, or the licensed private adoption agency, or other agency, or whoever has assumed liability for such costs, all or part of the medical expenses incurred for the mother and the child in connection with the birth of the child.

Thus, A.B. had to prove a substantial commitment to his parental responsibilities and that he is a fit parent of his child. To establish substantial commitment and fitness these three elements must be proven: "1) support; 2) visitation; and 3) ability to care for the child." *In re Adoption of J.L.G.,* 01-269

2

(La.App. 1 Cir. 2/21/01), 808 So.2d 491, 493. If it is shown that the mother has thwarted the father's efforts, the father must prove that he is now willing and able to assume legal and physical care of the child and that he is fit to parent a child. La.Ch.Code art. 1138 (B)(2). This showing requires more than a father coming forth and expressing his desire to raise his child. *See In re Adoption of J.L.G.,* 808 So.2d 491. The Children's Code defines parental fitness in Article 1103(5):

> (a) That a parent has not abused the child. For purposes of this Subparagraph, abuse means the infliction of physical or mental injury which causes deterioration to the child, sexual abuse, exploitation, or overworking of a child to such an extent that his health or moral or emotional well-being is endangered.

> (b) That a parent has consistently offered to provide reasonably necessary food, clothing, appropriate shelter, or treatment for the child. For purposes of this Subparagraph, treatment means medical care or other health services provided in accordance with the tenets of a well-recognized religious method of healing with a reasonable, proven record of success.

> c) That a parent suffers from no medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency which makes him unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.

> (d) Viewed in its entirety, the parent's past or present conduct, including criminal convictions, would not pose a risk of substantial harm to the physical, mental, or emotional health of the child.

In *In re McLarrin*, 38,616, p. 6 (La.App. 2 Cir. 2/4/04), 865 So.2d 317, 321-22, *writ denied*, 04-0595 (La. 3/24/04), 871 So.2d 331, the appellate court stated (*quoting Lehr v. Roberston,* 463 U.S. 248, 261-62, 103 S.Ct. 2985, 2993 (1983)) (citations omitted):

> The significance of the biological connection is that it offers the natural father an opportunity that no other male

3

possesses to develop a relationship with his offspring. If he *grasps that opportunity* and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.

"This interest does not come into existence or is soon lost, however, if the father is unable to demonstrate that he is fit and committed to the responsibilities of parenthood." "[H]e must show that he has taken concrete actions to grasp his opportunity to be a father and that there is a potential for him to make a valuable contribution to the child's development." Simply showing a biological relationship and fitness is not enough to sustain the father's interest.

Additionally, the father has the burden of "showing his own commitment to his parental responsibilities, not the commitment of his family." *In re Adoption of EHM* 00-2705, p. 7 (La.App. 1 Cir. 12/15/00), 808 So.2d 397, 402.

Pursuant to the well-settled manifest error standard of review, "[s]ubstantial commitment and parental fitness are factual findings that are entitled to deference unless the trial court is clearly wrong." *In re Adoption of J.L.G.*, 808 So.2d at 498. Having reviewed the record and the findings of the trial court, we find the trial court was clearly wrong/manifestly erroneous in finding that A.B. proved that he is fit to parent Baby D.

A.B. testified that he and C.D. dated for about eight months in 2004 and 2005. He stated that he believed he was the father of the child, but that he did not know her name nor when she was born. He stated that he was eighteen at the time of trial and lived in a three-bedroom trailer with his parents. A.B. said that he has his own room while his eight-year-old brother sleeps on the couch. A.B. testified that he was not presently employed but had "several jobs" waiting once the court proceedings ended including building fences, general construction, and training to be

4

a welding inspector. He claimed that his future income would be "around twenty dollars an hour." A.B. stated that he has never been convicted of a crime, does not take illegal drugs, and hardly ever drinks anymore.

A.B. testified that he first found out about Baby D when he was served with the Intent to Surrender documents, sometime in late August or early September. However, on cross-examination, he testified that he had "heard" through mutual relatives of his and C.D.'s , that C.D. was pregnant. A.B. testified that he was willing and able to assume legal and physical care of the baby. He said his parents will help out for a while, but that he would pay them back "every cent" that they have to pay. A.B. testified that he tried to contact C.D. before the birth of the baby, but that she would never answer the phone.

On cross-examination, A.B. testified that he worked as a painter's helper for a few months around the time of the hurricanes and that he worked for one week, but that the was fired for missing too many days of work. He further testified that he had been unemployed since the previous time he had appeared in court, four weeks earlier, and that he had not attempted to find a job. A.B. also testified that he quit going to school in the fourth grade, at which time his grandmother began home schooling him, but that he was not aware if she registered with the state for home schooling. However, he testified that she did not use any books and just "wrote down stuff on paper." He further stated that he had not participated in any testing since the fourth grade and that he had a relative write down the answers to questions that counsel put forth because he does not write well.

5

A.B. testified that his father is currently on probation for distribution of marijuana, and also had numerous prior arrests and convictions. A.B. stated that, although he is not smart, no other person could show the baby as much love as he could. He testified that his mother or aunt would take care of the baby while he worked. He further testified that he does not have a car, but uses his mother's car when necessary. A.B. further stated that he goes out to a bar called "Cowboys" with his friends and drinks because they ask him to, even though he is not of legal drinking age.

T.B., A.B.'s mother, testified that her eight-year-old son sleeps on the couch because he wants to. She stated that they heard that C.D. was pregnant three months before they received a phone call from the lawyer handling the Intent to Surrender. T.B. stated that they had no firsthand knowledge from C.D. or her family of C.D.'s pregnancy. She said that they knew nothing about the baby including the sex or her birthday. T.B. testified that she took A.B. out of school in the fourth grade because "she couldn't get him to go." T.B. testified that she works at a laundromat making $6.00 an hour. She testified that she drives to work in a truck that is not registered in her name because she does not have a driver's license due to outstanding charges. She claims that she has not cleared up the charges even though she has the means because she is afraid she might go to jail. T.B. further testified that she pays for all the food for the family, the utilities, and A.B.'s cell phone. T.B. stated that her husband has had a DWI and was convicted of indecent exposure with a juvenile. She testified that her son drinks with his friends when he goes to "Cowboys."

6

T.B. testified that she spoke to C.D. two weeks before the baby was born and offered to let her live at her house so that C.D. would not have to give up the baby for adoption. She also testified that A.B. spoke to C.D. that day.

R.B., A.B.'s dad, testified that they had heard rumors that C.D. was pregnant, but that the first confirmation of it was when they received the Intent to Surrender paperwork. R.B. testified that he is employed making $20 an hour. He stated that he is on five years supervised probation for possession of marijuana with intent to distribute. He stated the probation includes random drug testing.

J.D., A.B.'s grandmother, testified that she home schooled A.B. until he was thirteen or fourteen years old. She stated that he does not write well. She further stated that A.B. would make a good father.

C.D. testified that she first found out that she was pregnant when she four or five months into her pregnancy. She said that she called A.B. and told him she was pregnant. However, C.D. stated that the next day she called A.B. back at her mother's direction, and told him that she was not pregnant. C.D. claimed that she saw one of A.B.'s friends in a store when she was visibly pregnant (seven or eight months pregnant) and that A.B. told her on the telephone that the friend had seen her. C.D. stated that, at that time, she told A.B. that she was going to put the baby up for adoption.

C.D. testified that A.B. did not offer to pay any expenses of her pregnancy. She stated that her mom and dad paid for the expenses, except that the Does paid the medical bills. C.D. confirmed that T.B. offered her a place to live while she was pregnant and after the birth of the baby. C.D. also stated that she never

7

informed A.B. as to the baby's birthday or sex. She said that A.B.'s aunt called shortly after the baby had been born and that A.B. was present during the conversation, but that she did not want to speak to the aunt. She further stated that A.B. never asked to see the child. C.D. testified that she did not ask for any help from A.B., nor did he offer any. C.D. made it clear that she did not want A.B. calling her because she was afraid it would stir up trouble in her home. She further testified that she did not tell A.B. or his family where the baby would be born because she did not want them showing up at the hospital. C.D. further testified that she never told A.B. again that she was pregnant after she called and told him she was not. C.D. further said that, although she had not seen A.B. do drugs, he told her that he had done drugs, probably Ecstacy and crystal methamphetamine, and that she knew that he hung around with people who did drugs.

The trial court found that A.B. was thwarted by the mother and stated (our emphasis added):

> This Court has to decide today whether the rights of a biological father should be terminated by his educational background, his economic status and *his ability to care for this child*. The Court finds that those factors should not impair or impede a biological parent from asserting his rights. So, the court finds that because the father was thwarted and because of the efforts of the mother and her agents from keeping the child from this father, I think the father has, indeed, established his parental rights, and, as a result thereof, the Court's going to declare that no adoption will be granted without his consent.

> On this issue of the placement of [Baby D] I do not find at this time that it would be in the best interest of the child to place this child in the father's custody until a determination, a possible evaluation, including and not limited to a home study and a psychological evaluation and any other evaluations that are to be deemed necessary to take place. . . .

> In the absence of any silence in terms of the custodial arrangement at this point, I want it to be noted for the record that there

8

was not a surrender executed by the mother. There was an attempted surrender. That has a legal significance inasmuch as the mother now has the rights and custody of this minor child.

## SUBSTANTIAL COMMITMENT

We begin our discussion with an analysis of the statute at issue. Louisiana Children's Code Article 1138(A) provides that the father must prove he manifested a substantial commitment to his parental interest and that he is a fit parent. To prove that *substantial commitment,* he must show that he provided financial support to the mother which includes during her pregnancy, the birth of the child, and support of the child after birth. The statute also requires that when he is thwarted by the mother in making those efforts, as was found by the trial court in this case, the father must prove that he was willing and made reasonable attempts to provide that substantial commitment. Further, according to the statute, he must show that he is now willing and able to assume legal and physical care of the child. Finally, the trial court must consider the best interests of the child. In that regard, we find that A.B. came woefully short of overcoming his burden of proof in this instance.

While A.B. claims that he did not know about Baby D until after the birth of the child, he testified that he "heard" that C.D. was pregnant from relatives both he and C.D. shared. Yet, with that knowledge, he made no attempts to discover if he was, in fact, the father of the child. He offered no proof that after being served with the Intent to Surrender, he made any attempts to visit the child or pay for any of the expenses. There is no evidence in the record that he made any reasonable attempts to manifest any substantial commitment. From the time he was served with the Intent to Surrender until the time of trial (a period of four months), there was no

9

evidence A.B. provided any financial support to C.D. Thus, we find that A.B. failed to show a substantial commitment to parenting in providing financial support to his child. Further, we find that he failed to prove his parental fitness.

## PARENTAL FITNESS

It appears to us that the trial court dismissed A.B.'s burden of proving that he is fit to parent his child, because the trial court specifically stated that A.B.'s "ability to care for this child," did not impair his ability to assert his parental rights. On the contrary, A.B. had the burden of proving that he has ability to care for the child. As we have said, we find that this burden was not met. It is undisputed that A.B. had no work history other than a job he held for a week and lost because he missed too many days of work, had no job at the time of trial, and had only speculative future possibilities for a job. Nothing in A.B.'s background shows the necessary responsibility and commitment required to raise an infant. His lack of an appropriate education further hinders his ability to gain stable employment.

Moreover, there was no indication that A.B. would be able to independently provide a suitable home for this child. A.B.'s own mother testified that she paid all the bills and that she did not expect that A.B. would be moving out of her residence any time in the near future. A.B. had to prove his present fitness for custody, and this cannot be done by simply stating his future desires to get a $20 an hour paying job or to move out of his parent's home. Moreover, pursuant to La.Ch.Code art. 1103(5)(b), A.B. had to prove that he could provide "appropriate shelter" for the child. We do not believe that the record supports that his current living situation meets that definition.

10

A.B. testified that his mother would take care of Baby D while he worked. However, his mother had a job that took her out of the home during the day. It is also noteworthy that she admitted that she will not go to court to take care of outstanding charges because she is afraid "she will go to jail," despite the fact that she apparently had a large medical malpractice settlement that would have paid for whatever fines had been assessed against her. She continues to break the law by driving a vehicle while her license is suspended. Her youngest son, A.B.'s eight-year-old brother, has ADHD with aggression and sleeps on the sofa "because he wants to." A.B.'s father has a lengthy rap-sheet with multiple arrests and convictions, and he is currently on probation. None of these undisputed facts lead us to a finding that A.B. can provide a suitable home for Baby D. Additionally, we found C.D.'s testimony to be very reliable. She stated that A.B. ran with the wrong crowd, and had told her that he had done drugs. Viewing all of these facts together, we find that A.B. failed to prove he was fit to raise Baby D. Additionally, as we have noted, Article 1138(C) requires as a primary consideration that the best interests of the child be considered. Considering the foregoing facts, we cannot find that it would be in the best interests of this child for A.B. to assume legal and physical care of this child and that his parental rights be maintained. Accordingly, his parental rights are terminated and he cannot challenge the adoption.

## CONCLUSION

The judgment of the trial court maintaining A.B.'s opposition to the adoption of Baby D is reversed, and judgment is now rendered terminating his parental rights. All costs of the appeal are assessed against A.B.

**REVERSED AND RENDERED.**

11