26 So.3d 1001 (2009)
In re Jada Dean SUTTLE (Private Adoption), Plaintiff-Appellee.
v.
Marcus EASTER, Defendant-Appellant.
No. 45,236-JAC.
Court of Appeal of Louisiana, Second Circuit.
December 10, 2009.
Writ Denied January 19, 2010.
*1002 Rachel King, for Appellant, Marcus Easter.
Kimberly S. Smith, for Appellee, Jada Dean Suttle.
Jerald N. Jones, for the Child.
Before BROWN, STEWART, CARAWAY, MOORE and LOLLEY, JJ.
CARAWAY, J.
This private adoption proceeding was brought by the stepfather of a three-year-old after the death of the child's mother. After receiving notice of the proceeding, the biological father opposed the adoption, and a contest over his parental rights ensued with the plaintiff claiming that the biological father had never manifested a substantial commitment to the child. The juvenile court agreed with the plaintiff and terminated the parental rights of the father. For the following reasons, we affirm.

Facts
On May 15, 2009, Jada Dean Suttle initiated proceedings for the private adoption of A.D., the biological daughter of Suttle's recently deceased wife, April. A.D. was born on May 15, 2006, and her birth certificate does not identify anyone as her biological father. Suttle and April were married five months later on October 14, 2006, and Suttle assumed the duties of parenting the minor child. On November 25, 2008, April, who was predeceased by her parents and had no siblings, died leaving no will designating a tutor or guardian for the minor child. The child has remained in Suttle's physical custody since April's death.
The adoption petition requested that notice of the proceedings be given to Marcus Easter, the alleged biological father of A.D., but asserted that his consent to the adoption was unnecessary due to his failure to take any steps to establish his parental rights. The court entered an order placing the minor child in the interim custody of Suttle during the pendency of the proceedings and set the adoption hearing for July 6, 2009. At the hearing, Easter made an appearance in proper person and requested DNA testing to determine paternity. The court ordered the testing, appointed an attorney to represent the *1003 child and reset the matter for further hearings.
On August 24, 2009, newly enrolled counsel for Easter filed an opposition to the adoption asserting DNA testing results which indicated a 99.999% probability of his paternity. Easter alleged that his attempts to locate April had been unsuccessful and that he had temporarily paid for the child's care until he learned that another man was claiming to be the father. Lastly, the opposition alleged that a 2007 paternity and child support suit filed by April had been dismissed.
Trial of Easter's opposition occurred on October 9, 2009, in what the court minutes reflect as a closed courtroom. Easter testified that he is 36 years old, has recently taken employment as a quality assurance supervisor for Game Stop, and has an annual income of approximately $50,000. He has never been married and has a family support system in both the Shreveport-Bossier and Dallas areas. He testified that once he received confirmation that he was the child's biological parent he contacted a pediatrician, visited a daycare center near his home and made arrangements to enroll A.D. in their preschool program, and moved from a one-bedroom to a two-bedroom apartment. He also indicated his willingness to assume parental responsibility for the child.
Easter testified that he and April met at a party in October of 2005 at the home of Brian Jackson, a mutual friend. Easter and April left the party together, went to Easter's residence and had sexual intercourse. Three weeks later, April phoned Easter to tell him that she was pregnant. At approximately six weeks of pregnancy, Easter went to visit April in the hospital where she told him that she suffered from Crohn's disease. He saw her once more. In January of 2006 he moved from Shreveport to Mesquite, Texas. Easter testified that April called him on May 16, 2006, to tell him that A.D. had been born the previous day. Easter first saw the baby on the weekend of July 4, 2006, when he took her to meet his family.
Easter asserts that he asked April to submit to DNA tests to confirm his paternity both before and after the birth. He claimed that although she agreed, she never made herself or the baby available. Easter also testified that after he returned to Mesquite, he sent April a money order. The amount of the money order, however, was not revealed. Sometime later he sent her a check but stopped payment on it before April had an opportunity to cash it. He did so because his sister told him that another man was claiming to be her father which caused him to question his paternity.[1]
Easter also filed in evidence certain pleadings from a November 2006 "Petition to Determine and/or Declare Paternity and to Establish Child Support" filed by the Louisiana Department of Social Services, on behalf of the minor child seeking a judgment against Easter establishing paternity and child support. The petition alleged that April and Easter "maintained a sexual relationship during 2005" which resulted in the conception and birth of the child.
Easter filed a handwritten answer and admitted to having had a sexual "relationship" with April and to knowledge of both the pregnancy and birth of the baby. *1004 Easter did not deny being the father of the child, but requested a DNA test to confirm paternity. The parties filed a joint motion for paternity testing and an order signed on April 19, 2007, directed April, Easter and A.D. to submit to the collection of tissue samples for DNA testing. No other pleadings from the action which may have occurred were offered into evidence. Easter testified that he submitted to the DNA testing at the designated location in Dallas, Texas, but on or around May 7, 2007, received a letter from Support Enforcement Services which read in pertinent part as follows:
Dear MARCUS EASTER:
Your child support case with the above referenced person has been closed with the Agency.
If you are under obligation to pay child support, any future child support payments should be paid directly to the custodial parent.
The termination of your obligation through this office does not exempt you from making child support payments. You should contact the custodial parent and/or your attorney to determine what actions you should take in the future.
Easter testified that the letter caused him to believe that April knew or was not sure whether he was the father, although he admitted that he had no direct communication with April about the support action at that time. He also claimed that he called support enforcement and was told that the letter meant "nothing" and that he did not have to do anything further. Easter admitted that he never consulted with or hired an attorney to investigate the paternity issue any further. When asked why he took no affirmative steps to resolve his confusion over paternity, Easter referred only to his failed attempts to contact April to request DNA testing.[2]
After considering the testimony and evidence, the trial judge ruled that Easter had not established his parental rights because he failed to establish a substantial commitment to his parental responsibility as required by La. Ch.C. art. 1138 (hereinafter "Article 1138"). Because of April's actions in informing Easter of his paternity before and after the child's birth, the trial court ruled that Easter "knew at a very early stage that there was a significant possibility that [he] had fathered a child." In a written judgment, the court terminated Easter's rights per La. Ch.C. art. 1138(D) and certified A.D. for adoption. The instant appeal followed.

Law
Louisiana recognizes three types of adoptions: agency adoptions, private adoptions and intra-family adoptions. La. Ch.C. art. 1170. The matter before us is a private adoption which is governed by Title XII, Chapter 10 of the Children's Code. La. Ch.C. arts. 1221, et seq. La. Ch.C. art. 1221 reads as follows:
A single person, eighteen years or older, or a married couple jointly may petition to privately adopt a child. When one joint petitioner dies after the petition has been filed, the adoption proceedings may continue as though the survivor was a single original petitioner.
Additionally, La. Ch.C. art. 1224 provides as follows in relevant part:

*1005 C. If the adoption petition names an alleged or adjudicated father and his parental rights have not been terminated by a court of competent jurisdiction, he shall be served with notice of the filing of the petition in accordance with Articles 1133, 1134, and 1136 and thereafter, his rights shall be determined in accordance with the provisions of Articles 1137 through 1143.
In keeping with these provisions from Chapter Ten, the trial court applied Articles 1137[3] and 1138 of the Children's Code for the adjudication of Easter's parental rights. Article 1138 of the Children's Code provides as follows:
A. At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child.
B. Proof of the father's substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:
(1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
C. The child, the mother of the child, and the legal custodian may offer rebuttal evidence limited to the issues enumerated in Paragraphs A and B of this Article. However, the primary consideration *1006 shall be, and the court shall accept evidence concerning, the best interests of the child.
D. If the court finds that the alleged or adjudicated father has failed to establish his parental rights, it shall decree that his rights are terminated.
E. If the court finds that the alleged or adjudicated father has established his parental rights, the court shall declare that no adoption may be granted without his consent. The court may also order the alleged or adjudicated father to reimburse the department, or the licensed private adoption agency, or other agency, or whoever has assumed liability for such costs, all or part of the medical expenses incurred for the mother and the child in connection with the birth of the child.
Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. When an unwed father demonstrates a full commitment to the responsibilities of parenthood and an ability to participate beneficially in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the state and federal due process clauses. State in the Matter of R.E., 94-2657 (La.11/9/94), 645 So.2d 205; In re Adoption of B.G.S., 556 So.2d 545 (La.1990), citing Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
Under the statutory scheme implementing these principles, the unwed father is afforded notice and a hearing at which he has an opportunity to demonstrate his biological link and substantial relationship with the child. La. Ch.C. arts. 1130-1143; State in the Matter of R.E., supra. In accordance with the Louisiana Supreme Court's decision in In re Adoption of B.G.S., supra, the statutes (La. Ch.C. arts. 1137-1138) contemplate that the unwed father's constitutionally protected interest in a parent-child relationship does not come into existence until the father demonstrates his fitness for parental responsibilities, commitment to those responsibilities, concrete actions taken to grasp his opportunity to be a father, and the potential for him to make a valuable contribution to the child's development. The burden of proof is upon the putative father to show the preservation of his opportunity to establish parental rights by proving these interrelated elements by a preponderance of the evidence. La. Ch.C. art. 1138; State in the Matter of of R.E., supra. If the father carries this burden, his parental rights become established, no adoption may be granted without his consent, and custody of the child will be granted to him. Id. If the father fails to carry this burden, his parental rights are not brought into existence, and the court shall decree that the father's rights to oppose the adoption are terminated. Id.
The biological father does not necessarily have a fully established protected right to a parental relationship with his child until he demonstrates his fitness and commitment according to the standards provided by the law and our decisions. Due process guarantees him notice, hearing and an adequate opportunity to make such a showing; it does not require, however, that he be presumed fit and committed to parental responsibilities or that the burden of proving otherwise be allocated to the parties supporting the surrender *1007 and adoption of the child. State in the Matter of R.E., supra.
It is well settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47. "Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court." In re A.J.F., supra; Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where the fact finder is presented with two permissible views of the evidence, the fact finder's choice between them is not clearly wrong. Id.
Substantial commitment and parental fitness are factual findings that are entitled to deference unless the trial court is clearly wrong. In re Adoption of J.L.G., 01-0269 (La.App. 1st Cir.2/21/01), 808 So.2d 491, citing In re A.J.F., supra.

Discussion
Easter's argument to the trial court and this court effectively admits his failure to have complied with the financial and emotional support requisites of Article 1138(B)(1). He does not claim that he ever "manifested a substantial commitment to his parental responsibilities" to the child during the child's life of three years before commencement of this action after the mother's untimely death. Instead, Easter attempted to prove under Article 1138(B)(2) that "he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother."
The tests of Article 1138(B)(2) concern actions of both the father and the mother that may or may not lead the father to understand that he is the child's father and to accept his parental responsibilities. In this case, regarding the mother's actions, the most important fact is April's assertion to Easter before and after the child's birth that she believed him to be the father. Easter did not testify that he was ever told by April anything other than that he was the father. The consistency of April's claim when coupled with Easter's knowledge of their sexual encounter represents a strong proof of his paternity even though it is not the equivalent of the DNA testing that ultimately occurred. Article 1138(B)(2), however, does not require a DNA test. As to the mother, it requires that she not "thwart" an understanding that he is the father or his efforts to fulfill his parental commitment. In this case, April did not "thwart" Easter's understanding of her pregnancy and his probable paternity by her silence. Instead, she informed him of her well-founded belief that he was the father. Accordingly, from Easter's own testimony, he shows that April did exactly what the law expected of her. The parental rights he now belatedly claims were allowed by April to be exercised by Easter beginning at the child's birth, and he did not act.
In contrast to the directive to the mother under Article 1138(B)(2), the father is charged affirmatively to make reasonable efforts to begin performance of his parental commitment. That effort regarding financial support is shown under Article 1138 to begin during the pregnancy. With this in mind, the first significant period of action (and inaction) of Easter occurred between the time of the child's birth on May 15, 2006, and the time of the filing of the state's support action in October of 2006. His actions consisted of a brief summer visit with the mother and child and the tender of two support payments to aid them. The amount of one payment was *1008 never stated by Easter, and the other payment was withdrawn. The implications of those acts do not suggest that Easter harbored serious doubt about his paternity. His explanation for stopping payment on the check was not because April informed him that he was not the father. Throughout those first five months of the child's life, Easter ignored the financial duties and responsibilities of a father while never once protesting to April that she was in error regarding paternity or seeking confirmation of paternity through DNA testing. A measurement of whether he "made reasonable attempts" to fulfill his parental responsibilities during that time period alone finds him lacking.
In his argument, Easter asserts that he cannot be held to have neglected and abandoned his parental rights until a DNA test. As shown above, that is not the test of Article 1138, and April gave Easter a consistent view that he was the father. Under the rationale of the rulings of our highest courts, state and federal, discussed above, the unwed father does not waive his paternal rights; they come into existence only as he takes initiatives toward the child. This would include an initiative to clarify any doubt about his paternity as quickly as possible, so as to continue the development of the mutually beneficial and essential bond with the child.
Easter next asserts a timeline for the gestation period for the baby which allegedly gave him much doubt about his paternity. He claims that his one sexual encounter with April was in October 2005, so that the pregnancy lasted only seven months. Nevertheless, from the record, the specific date of the parties' sexual intercourse was not identified, nor was objective medical evidence presented confirming the child's premature birth. Moreover, he never reported that he confronted April with these concerns or examined the medical evidence of the gestation period upon the child's birth. Therefore, with objective evidence in support of this gestation argument missing from Easter's evidence, the trial court could ignore Easter's self-serving testimony regarding his timing for the parties' sexual relationship.
Easter's argument concerning the state's support action which was filed five months after the birth also gives him no justification for the continuation of his delinquency regarding a substantial commitment to his parental responsibilities. In the first place, the action itself is notice of his ongoing delinquency since the birth. The state based its petition on April's continued assertion of paternity to the state authorities. Most importantly, contrary to assertions in Easter's brief regarding the support action, April did not close the case. She was not a party to the case. The Department of Social Services was the party plaintiff on behalf of the child. Finally, when the support action was dismissed, whatever the unexplained reason for dismissal, Easter was instructed by the state that his obligation for support would continue.
As shown by Article 1138, the unwed father must affirmatively act "to make reasonable" efforts to fulfill parental responsibilities beginning at the child's birth. Overall, Easter's assertions rest upon an alleged dilemma which paralyzed him with indecision from the birth throughout the first three years of the child's life. He asserts his two conflicting desires causing this dilemma. His desire to be a father and make a substantial commitment to this child, and his desire to know for certain that he was the father. Since he never acted to satisfy his desire to establish paternity, he was content to indefinitely defer his other desire and forgo any relationship with the child. Since the record indicates that April acted reasonably at all *1009 times, fairly accommodating Easter's now expressed desire to meet his parental responsibilities, we do not recognize the dilemma which Easter now argues nor do we find it as justification for his inaction under the test of Article 1138.
In his remaining assignment of error, Easter asserts that the proceedings were improper due to the presence of "several other deputies" "in this closed hearing [which] gives a strong appearance of impropriety that should not be present in our judicial system" and "was intimidating to all witnesses including Appellant."
In view of this assignment of error and the lack of any contemporaneous objection or other indication in the record concerning other persons in the courtroom, this court requested that both sides provide further information regarding this matter. Easter's counsel argues that she "noticed the additional deputies and made serious objections" after the trial was complete when her client first called it to her attention. Counsel claims to have "turned around and noticed three (3) deputies sitting behind Appellant and wondered why all the additional persons were present." Easter himself claimed seeing "five (5) total deputies in the courtroom at different times," with "three (3) sitting together behind him, with one additional other deputy coming in and out of the courtroom." He claims that the presence of the officers made him uncomfortable. While Suttle concedes that "two (2) other deputies were present at the back of the courtroom during a portion of the proceeding," he contends that the individuals were not his friends and have no personal relationship with him.
Title IV of the Louisiana Children's Code addresses Juvenile Court Administration. Chapter 2 of Title IV contains provisions for the scheduling and conducting of cases. La. Ch.C. art. 407 is found in Chapter 2 and addresses the confidentiality of hearings as follows:
With the exceptions of delinquency proceedings pursuant to Article 879, child support proceedings, traffic violations pursuant to Chapter 2 of Title IX in parishes with a population between three hundred eighty thousand and four hundred thousand, and misdemeanor trials of adults pursuant to Chapter 4 of Title XV, proceedings before the juvenile court shall not be public. However, the court shall allow the proceedings to be open to the public when the alleged delinquent act committed by the child would be considered a crime of violence as defined in R.S. 14:2(B), or when the alleged delinquent act would be a second or subsequent felony-grade adjudication.
See also La. Dist. Ct. R. 42.3.
The minutes of the trial of Easter's objection to this adoption reflect that the matter was tried as a closed hearing in accordance with Article 407 of the Children's Code. Because of the seriousness of a violation of the privacy of the hearing, this court requested the attorneys to give their recollections of the issue to supplement the record. The agreement between these accounts is that two, or possibly three, deputies in addition to the bailiff were in the courtroom together for some unidentified period of time. Easter's counsel believes the other deputies were assigned to the court. Significantly, however, Easter's counsel does not assert that in her presentation of Easter's important testimony, she became aware that his testimony was affected in any manner by the presence of the officers.
While we believe that there was probably some violation of the privacy of the hearing, any such violation was by court personnel whose duties and office require them to honor and maintain the privacy of *1010 any such matters before the juvenile court. Moreover, any assertion of prejudice to the appellant is unfounded as his admissions of his failure to provide financial and emotional support to the child are clear. Accordingly, the issue raised by appellant does not support a reversal of the trial court's ruling.

Conclusion
For the foregoing reasons, the judgment of the juvenile court terminating the parental rights of Marcus Easter is affirmed. Costs of this appeal are assessed to appellant.
AFFIRMED.
LOLLEY, J., dissents with written reasons.
STEWART, J., dissents for reasons assigned by J. LOLLEY.
LOLLEY, J., dissenting.
I respectfully dissent from the ruling of the majority in this matter.
The present matter involves the request of petitioner to terminate the parental rights of the biological father of the child. Proper notice was obviously served on the biological father who retained counsel to represent him in these proceedings.
The proceedings were initiated because of petitioner's desire to adopt the child who was born of her late mother prior to her marriage to petitioner.[1]
The record clearly shows that the child had lived with her mother and stepfather consistently until the mother's death. Subsequent to the event, petitioner initiated procedures to adopt the child. However, to move forward with the adoption, the parental rights of the biological father had to first be terminated. A petition for involuntary termination of parental rights was filed in accordance with the provisions of the Louisiana Children's Code.
The record further indicates that another judge was initially assigned to hear this matter. However, that judge exercised recusal because of familiarity with the petitioner and other members of the Caddo Parish Sheriff's Department. The present judge was assigned, and the proceedings got underway.
The hearing was called into session and evidence was presented. At the conclusion of the hearing the court ordered that the parental rights of the biological father were terminated and that the child be freed for the purpose of adoption.
I am of the opinion that reversible error occurred during the proceedings and that the judgment/ruling of the juvenile court judge should be reversed and ultimately declared null.
A petition to terminate the parental rights of a biological parent is the most serious of all actions contemplated by the Louisiana Children's Code. This petition, whether advanced by the State of Louisiana or, as in the present matter, by the stepparent for purpose of potential adoption, sets the stage to forever sever what is amongst the strongest bonds, that of parent and child. It is, in fact and law, the parental death penalty. Additionally, because of the serious nature of the proceedings and its lasting consequences, a termination of parental rights proceeding has attached to it the second highest burden of proof in law, that of clear and convincing evidence.
The biological father has appealed the ruling of the juvenile court judge on *1011 grounds that the allegation did not rise to the level of clear and convincing evidence and on grounds that there was a serious breach of the rule(s) of sequestration at the termination of parental rights hearing itself.
A review of the entire record of these proceedings leads me to conclude that the actions/inactions of the juvenile court judge did, in fact, lead to serious and fatal breaches of the mandated rules of sequestration.
Hearings and the issues of sequestration are extensively discussed in the Louisiana Children's Code. Article 408 states that it is the duty of the judge to control the proceedings. Article 409 mandates sequestration of witnesses. In matters involving children in need of care, Art. 661 mandates who may be present at the proceedings. Article 1015 deals specifically with termination of parental rights. The sequestration effects of the above articles also are applicable to a termination of parental rights proceedings. Title XII of the Louisiana Children's Code deals specifically with the issues of adoption. Article 1184 specifically addresses admission to adoption hearings. It also specifically mandates sequestration at the hearing.
The thrust of all of the above articles in the Louisiana Children's Code is to maintain the confidentiality of the hearings, which are very serious in nature. The reasoning for this is that the parties to the proceedings rightfully should not be subjected to public scrutiny. A notable exception to this, however, is officers of the court.
In the matter before us the petitioner was, and is, a deputy sheriff employed by the Caddo Parish Sheriff's Office. The record clearly reflects that he was wearing his uniform during the entirety of the proceedings.[2] The record also reflects that other uniformed deputies entered the courtroom, sat down and observed the proceedings at the time. This was noted by both the biological father and his counsel. The biological father now urges, rightfully in my opinion, that this constitutes a fatal breach of the sequestration rule and that the decision of the juvenile judge should be reversed and the matter be sent back for another hearing.
As previously stated, officers of the court are generally exempted from the sequestration order and allowed to remain or enter the courtroom. I am of the opinion that this exception to sequestration applies only to officers of the court who are assigned to work that courtroom on that date on that case. Because of the nature of the case I am of the opinion that all others are subject to the sequestration rule/order and that it was error to allow their presence in the courtroom.
The majority is of the opinion that this complaint is of no consequence and should not be considered because a contemporaneous objection was not raised by counsel at the time(s) of occurrence. I disagree.
I am of the opinion that the error on the part of the juvenile judge was structural in nature and effect and therefore, any contemporaneous objection was not needed because the proceedings had become a nullity. The issues of structural error have been discussed by other courts of this state, including the Louisiana Supreme Court. It is error which by its very nature is not subject to a harmless error analysis. It impacts the entire framework of the trial from beginning to end without reference to any other trial consideration.
*1012 In the matter presently before this court I am of the opinion that the actions of the juvenile court judge failed in the area of maintaining a sequestered courtroom and in maintaining his duty to control the proceedings in the courtroom as mandated by Art. 408. In a proceeding such as this, any officers of the court cannot and should not casually come and go in a sequestered courtroom.
In a proceeding such as the one discussed here, it is of vital importance that all parties leave the courtroom with the feeling and/or opinion that they clearly received their fair day in court. With the stakes as high as they are in a termination of parental rights hearing for the purpose of adoption, these issues are of great importance. It is more important that a civilian with little or no knowledge of proceedings such as these leave the courtroom without feeling the chilling effect of the errors I believe were committed. He, like all others, has the absolute right to be afforded all of the due processes of the law applicable to the case as he stands before the court to answer to.
Accordingly, I respectfully dissent.
NOTES
[1] Easter's sister, Tiffany Alexander, testified that in September 2006, she saw A.D. in a mall in Shreveport accompanied by Suttle. Recognizing the child from the July 4th meeting, she approached Suttle, asked him the child's name and age and whether he was the child's father. Tiffany then called her brother, told him about the encounter and encouraged him to get a DNA test.
[2] Rory Jones, a former high school classmate of Easter's, former brother-in-law of Suttle's and friend of Brian Jackson's also testified to his knowledge of the events. Jones and Suttle had been acquainted for years but recently parted ways. Jones testified that Jackson had always believed that he was A.D.'s biological father, but that he did not communicate that information to Easter. In fact, Jones had not talked to Easter after his move to Texas. Jones alleged that Suttle asked him not to tell Easter about the adoption proceedings.
[3] La. Ch.C. art. 1137 provides:

A. An alleged or adjudicated father or his representative, if applicable, may oppose the adoption of his child by filing a clear and written declaration of intention to oppose the adoption. The notice of opposition shall be filed with the court indicated in the notice of filing of surrender within fifteen days after the time he was served with the notice of surrender, or from the time he was served with notice of the filing of an adoption petition in the event that no surrender was executed or filed.
B. Upon receipt of the notice of opposition, the court shall appoint an attorney to represent the child, subject to the limitations set out in Article 1121. Neither the child nor anyone purporting to act on his behalf may be permitted to waive this right. The costs of the child's representation shall be taxed as costs of court.
C. The court shall set the opposition for contradictory hearing, which hearing shall be held within twenty days of the filing of the opposition.
D. Notice of the hearing shall be served in accordance with Articles 1133 and 1134 on the opposing father, the legal custodian, counsel appointed for the child, and the mother of the child through the agency to whom the child was placed or through the attorney who represented the mother in a private surrender unless otherwise waived in the Act of Surrender executed pursuant to Article 1122.
E. If paternity is at issue, on its own motion or motion of any party, the court shall issue an order for immediate blood or tissue sampling in accordance with the provisions of R.S. 9:396 et seq. and shall order an expedited report. The hearing resolving this issue shall be held at the earliest time that the results of the testing can be reported to the court.
[1] The record also clearly indicates that respondent was identified as the biological father through DNA testing.
[2] I feel that the issue of petitioner being in uniform is of no consequence. He could well have been just coming off duty or reporting to duty after the hearing.