Judgment rendered April 13, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 1143,
La. Ch. C.

No. 54,460-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

IN RE: APPLYING FOR PRIVATE ADOPTION C.J.P.

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. A-664

Honorable Bruce Edward Hampton, Judge

* * * * *

| | |
|---|---|
| RICKY LANE CANDLER | Counsel for Appellant, Shedrick Green, III, Father |
| FORREST L. MOEGLE | Counsel for Appellee, C.J.P., Child |
| ODOM-SASKA ADOPTIONS, LLC<br>By: Terri Hoover Odom | Counsel for Appellees, D.J.M. and C.L.(T).M., Adoptive Parents |
| DAVID SUMMERSGILL, PLC<br>By: David Joseph Summersgill, Jr. | Counsel for Appellee, Queen Emuni Yla Swahili Payton, Mother |

* * * * *

Before PITMAN, STEPHENS, and THOMPSON, JJ.

**THOMPSON, J.**

An unwed father appeals the termination of his parental rights and approval for placement of the child for private adoption. The trial court, tracking the considerations set forth in Louisiana's Children Code for such determinations, held the father had not legally acknowledged the child, had not made a substantial commitment to his parenting responsibilities, that he would not be a fit parent, and ordered the father's parental rights terminated and authorized the placement of the child for private adoption in accordance with the mother's request. Finding the trial court was not manifestly erroneous in reaching its decision, we affirm.

## FACTS

Queen Payton ("Payton") originally met Shedrick Green ("Green") on a prison van in 2018, and she became pregnant in the summer of 2019. On April 8, 2020, she gave birth to a baby boy, hereinafter sometimes referred to as "C.J.P." Payton testified that from the outset she did not want to parent her child with Green, because he already had several children with many mothers and had exhibited aggressive, abusive behavior towards her. Green has an extensive criminal history, including 8 total years of incarceration.

Initially, Payton planned to have an abortion, and she testified Green told her that he would pay for one-half of the cost of that procedure. As the date neared for the scheduled abortion, Green failed to pay his one-half and, unable to care for the child alone and with no support from Green, she contacted an adoption agency to arrange for a private adoption. Payton selected a couple from Texas as the prospective adoptive couple. The adoption agency contacted Green, and he refused to consent to the adoption.

C.J.P. was born on April 8, 2020, and on April 13, 2020, Payton executed a surrender for private adoption, which was filed in Lincoln Parish, where C.J.P. was born. Applications to the Interstate Compact on the Placement of Children ("ICPC") Offices in both Louisiana and Texas were made, due to the fact the prospective adoptive parents are residents of Texas. Pursuant to the Louisiana Children's Code, a child who is the subject of an adoption should not be brought from the sending state (Louisiana) to the receiving state (Texas), unless ICPC approval from both states has been granted. On April 15, 2020, while approval was pending, the trial court allowed the adoptive parents to return home to Texas with C.J.P. On April 21, 2020, the Texas ICPC office granted approval of C.J.P.'s adoptive placement. C.J.P. has resided with the prospective adoptive parents at their home in Texas since then. According to reports from post-placement supervisory visits, C.J.P. has bonded with the prospective adoptive parents and is thriving in their home. The supervising Social Study Provider ended her final post-placement report stating that C.J.P.'s placement with the prospective adoptive parents "is in his best interest as they continue to place his needs above everything else."

On May 8, 2020, Green filed an opposition to the private adoption. Green's opposition stated that Payton had informed him on several occasions that he was the father of C.J.P. The opposition also provided that Green "is not sure if he is the biological father of C.J.P." and requested "a suspension of adoption proceeding until DNA testing can be performed to determine if he is in fact the biological father of C.J.P."

On May 30, 2020, the prospective adoptive mother called Green, because Payton informed her that Green wanted to speak with the adoptive

parents. During that telephone conversation Green complained that the adoption was not legal and that C.J.P. should have been placed in foster care rather than placed for adoption. The prospective adoptive mother testified that Green did not ask how C.J.P. was doing or inquire about his physical characteristics during the call. The prospective adoptive mother offered to send Green photos of C.J.P., but he responded that he "had to think about some things" and rejected the offer. The prospective adoptive parents did not hear from Green again. Green claimed he lost their telephone number but offered no explanation for not undertaking efforts to contact Payton or the State to obtain the telephone number. Green did not file a request for visitation with C.J.P. During trips to Louisiana for court, the adoptive parents offered to meet Green in person but Green declined each invitation.

On June 29, 2020, DNA results were reported, which determined that Green is the biological father of C.J.P. Green's opposition to the private adoption was set for hearing on October 15, 2020; however, the hearing was continued without date.

After some delay, on May 7, 2021, trial of Green's opposition to the private adoption was held. At the trial, the mothers of some of Green's other five children testified that he is a good father, and he sees his children frequently at their own homes or at his mother's home. Green does not provide child support for any of his children, but some witnesses testified he does occasionally purchase items for them as needed. The mothers of Green's children who testified confirmed that they are the primary custodial parents of his children and do not have a formal custody arrangement or child support agreement with Green.

3

Payton testified that she did not want to parent a child with Green and that she had concerns about his parenting of his five other children. Payton also testified that Green had exhibited violent and abusive behavior toward her, including threatening her with a gun. Payton testified that she believed Green's mother would actually be the person providing any care for C.J.P. in the event Green had custody of him. Payton testified that Green offered her $2,000 not to go through with the private adoption. Payton believed that offer of money was not about keeping the baby. Rather, it was her belief that Green's opposition to the adoption was "about him keeping me." Green did not provide any funds to help with Payton and C.J.P.'s prenatal care or any other expenses.

Green testified that he loved children and did not personally believe in abortion or in giving one's child up for adoption. Green confirmed that he lived with his mother and that his mother assisted him with caring for some of his children in her home from time to time. Green also confirmed his criminal history, including arrests and incarcerations relating to drug and firearms charges. Green testified that he spoke with C.J.P.'s adoptive parents one time on the telephone but lost their phone number.

On June 22, 2021, the trial court ruled that Green failed to establish his parental rights as contemplated by La. Ch. C. art. 1138 and decreed that Green's parental rights were terminated. In its written reasons for ruling, the trial court determined that Green did not legally acknowledge C.J.P. prior to the May 7, 2021 trial when the DNA test results were filed into evidence.

The trial court also found that Green failed to prove by a preponderance of the evidence his substantial commitment to his parental responsibilities. The trial court determined that the $2,000 that Green

4

offered to Payton was not money for reimbursement of her medical expenses or a show of his ability and willingness to provide support to C.J.P. but, rather, was an offer to pay Payton to stop the adoption process. The trial court noted that Green does not pay child support for any of his other children. The trial court found that Green spends time with his children when it is convenient for him. Green receives substantial assistance from his mother, as well as financial support from a brother who is a former professional football player.

The trial court determined that the substantial commitment to support C.J.P. must come from Green, not his mother or his brothers. The trial court noted that Payton refused Green's offer of money for clothes, but her requests for help with her necessary living expenses went unanswered. Further, the trial court noted that Green provided the court with no tenders to support C.J.P., nor were any requests made for visitation. As to Green's fitness as a parent, the trial court noted that Green was incarcerated for 8 years beginning in 2010 and calculated the number of years that he was in prison away from each of his five young children. The trial court concluded that there was no objective evidence that Green meaningfully supports any of his other children or that he would support C.J.P.

Green appeals the trial court's ruling, denying his opposition to the private adoption and terminating his parental rights.

## ASSIGNMENTS OF ERROR

Green asserts four assignments of error, namely:

1. **The trial court erred by finding Green did not legally acknowledge the child.**

2. **The trial court erred by finding Green has not made a substantial commitment to his parental responsibilities.**

5

**3. The trial court erred by finding Green would not be a fit parent.**

**4. The trial court erred by terminating the parental rights of Green.**

**DISCUSSION**

Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. When an unwed father demonstrates a full commitment to the responsibilities of parenthood and an ability to participate beneficially in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the state and federal due process clauses. *State in the Matter of R.E.,* 94-2657 (La. 11/9/94), 645 So. 2d 205; *In re Adoption of B.G.S.,* 556 So. 2d 545 (La. 1990).

Under the statutory scheme implementing these principles, the unwed father is afforded notice and a hearing at which he has an opportunity to demonstrate his biological link and substantial relationship with the child. La. Ch. C. arts. 1130 -1143; *State in the Matter of R.E., supra.* In accordance with the Louisiana Supreme Court's decision in *In re Adoption of B.G.S., supra,* the statutes contemplate that the unwed father's constitutionally protected interest in a parent-child relationship does not come into existence until the father demonstrates his fitness for parental responsibilities, commitment to those responsibilities, concrete actions taken to grasp his opportunity to be a father, and the potential for him to make a valuable contribution to the child's development. The burden of proof is upon the putative father to show the preservation of his opportunity to establish parental rights by proving these interrelated elements by a

preponderance of the evidence. La. Ch. C. art. 1138; *State in the Matter of R.E., supra.* If the father carries this burden, his parental rights become established, no adoption may be granted without his consent, and custody of the child will be granted to him. If the father fails to carry this burden, his parental rights are not brought into existence, and the court shall decree that the father's rights to oppose the adoption are terminated. *Suttle v. Easter*, 45,236 (La. App. 2 Cir. 12/10/09), 26 So. 3d 1001, 1006, *writ denied*, 09-2826 (La. 1/19/10), 25 So. 3d 128

Applicable Louisiana law outlining the considerations of whether the father has established his parental rights are set forth in La. Ch. C. art. 1138, which provides:

La. Ch. C. Art. 1138, Hearing of opposition to adoption; establishment of parental rights:

A. At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child **and** by proving that he has manifested a substantial commitment to his parental responsibilities **and** that he is a fit parent of his child.

B. Proof of the father's **substantial commitment** to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:

(1) Provided financial support, including but not limited to the payment of **consistent support to the mother during her pregnancy**, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently **visited the child** after birth; and that he is **now willing and able to assume legal and physical care of the child**.

(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now

7

willing and able to assume legal and physical care of the child.

C. The child, the mother of the child, and the legal custodian may offer rebuttal evidence limited to the issues enumerated in Paragraphs A and B of this Article. However, the primary consideration shall be, and the court shall accept evidence concerning, the **best interests of the child**.

D. If the court finds that the alleged or adjudicated father has failed to establish his parental rights, it **shall** decree that his rights are terminated.

E. If the court finds that the alleged or adjudicated father has established his parental rights, the court shall declare that no adoption may be granted without his consent. The court may also order the alleged or adjudicated father to reimburse the department, or the licensed private adoption agency, or other agency, or whoever has assumed liability for such costs, all or part of the medical expenses incurred for the mother and the child in connection with the birth of the child.

La. Ch. C. art. 1138(A) provides three elements for establishment of parental rights: (1) acknowledgment of the child; (2) proof of manifestation of a substantial commitment to his parental responsibilities; and (3) parental fitness. All three of these elements must be met in order to establish one's parental rights. La. Ch. C. art. 1138(B) elaborates upon the types of proof required to show that a substantial commitment to one's parental responsibilities has been made. The unwed father must provide proof of **consistent support to the mother during her pregnancy,** support of the child after birth, **visits** with the child, or a **present** willingness and ability to care for the child. If an unwed father has failed to satisfy all three of the elements contained in La. Ch. C. art. 1138(A), then he has failed to establish his parental rights. Then, La. Ch. C. art. 1138(D) provides that if the father has failed to establish his parental rights, i.e. satisfy the three elements contained in La. Ch. C. art. 1138(A), it **shall** decree that his parental rights are terminated.

It is well settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *In re A.J.F.,* 00–0948 (La. 6/30/00), 764 So. 2d 47. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. *In re A.J.F., supra; Rosell v. ESCO,* 549 So. 2d 840 (La. 1989); *Arceneaux v. Domingue,* 365 So. 2d 1330 (La. 1978). Where the fact finder is presented with two permissible views of the evidence, the fact finder's choice between them is not clearly wrong. *Id.*

Substantial commitment and parental fitness are factual findings that are entitled to deference unless the trial court is clearly wrong. *Ex rel. E.C.B.*, 29,725 (La. App. 2 Cir.1/29/97), 691 So. 2d 687, 690, *writ denied*, 97-0307 (La. 1/31/97), 687 So. 2d 394.

**Assignment of Error No. 1:**   **The trial court erred by finding Green did not legally acknowledge the child.**

Green argues that the trial court erred in determining that he did not legally acknowledge C.J.P. Green asserts that DNA test results confirming his status as biological father and his filing of the opposition to the private adoption was sufficient acknowledgment, pursuant to La. Ch. C. art. 1138(A). According to Green, Article 1138(A) states that one must simply acknowledge that he is the child's father, without distinct measurement of how the acknowledgment must occur. Green contends that article 1138(A) does not impose a legal requirement of acknowledgment.

9

With regard to the term "acknowledgment" contained in La. Ch. C. art. 1138(A), the adoptive parents note in their brief to this Court that La. C. C. art. 209, which provided for informal acknowledgment of children, was repealed in 2005. Therefore, they argue that the only type of acknowledgement available to an unwed father is legal acknowledgment, as provided in La. C. C. art. 196. The comments to La. C. C. art. 196 state that a man who acknowledges a child creates a presumption that he is the father, which operates in favor of the child only. Such an acknowledgment is created by an authentic act in which the father acknowledges his paternity or by his signing the child's birth certificate as father.

In Green's opposition to the private adoption, he did not acknowledge paternity of C.J.P. but requested DNA testing to confirm whether or not he was the baby's biological father. There was no evidence presented at trial that Green signed C.J.P.'s birth certificate, filed with the Putative Father Registry, or otherwise created a legal acknowledgment of C.J.P. by an authentic act. Green's actual paternity was not established until the day of the trial, when the results of the DNA test that confirmed that he is C.J.P.'s biological father were accepted and entered into evidence. By then, C.J.P. was over one year old. As such, the trial court did not err by finding that Green did not legally acknowledge C.J.P. at any time prior to the trial of his opposition to the adoption. As such, Green's first assignment of error is without merit.

**Assignment of Error No. 2:** **The trial court erred by finding Green has not made a substantial commitment to his parental responsibilities.**

Green argues that the trial court erred by finding that he failed to manifest a substantial commitment to his parental responsibilities. To prove

10

substantial commitment to his parental responsibilities, Green is required to demonstrate that he provided support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child. Green asserts that he has made multiple attempts to provide support for Payton during her pregnancy but that his attempts were thwarted by her refusal to accept his assistance. Green asserts that his $2,000 offer to Payton was intended to demonstrate his ability and willingness to support and provide for the child. Green further argues that because C.J.P. was released to the custody of the adoptive parents and taken to Texas, he was unable to demonstrate a substantial commitment to his parental responsibilities.

As to consistent financial support, the record shows that Green never helped Payton with any of her living or medical expenses during her pregnancy. Green admitted that during Payton's pregnancy he did not actually give her any money, and only offered her money to buy maternity clothes – not to cover any medical or living expenses incurred during her pregnancy. As to visits with the child, Green only made one attempt to visit C.J.P. at the hospital during the pandemic. There is no evidence in the record that Green ever requested to visit or see the child again. Additionally, Green did not ask the Court for visitation with C.J.P. at any point during these proceedings. Green even declined an offer to meet with C.J.P. when the adoptive family travelled to Louisiana for hearings relating to this matter.

11

As to Green's willingness and ability to assume physical care of C.J.P., the record shows that Green lived at home with his mother. Green's testimony and his mother's testimony established that Green has always received substantial assistance from his mother in providing his housing and assistance in addition to caring for his other children. The trial court stated that "the substantial commitment has to come from Mr. Green, not his mother and brothers. His family's help would be a consideration if Mr. Green showed any commitment to the child, but he has not."

We find this case to be distinguishable from *In Int. of E.C.B.*, 29,725 (La. App. 2 Cir. 1/29/97), 691 So. 2d 687, 690, *writ denied*, 97-0307 (La. 1/31/97), 687 So. 2d 394,[1] which Green cites in support of his arguments regarding his substantial commitment to establishing his parental rights. The birthfather in *In Int. of E.C.B., supra*, timely opposed the adoption, formally acknowledged his child, and filed with the Louisiana Putative Father Registry. This Court found that those actions demonstrated affirmative efforts to establish a parental relationship with the child, and were concrete steps taken to grasp the opportunity to be a father and demonstrate his commitment to parental responsibility. Furthermore, these actions were taken within the narrow window of time. In this case, Green did not take similar steps to establish his parental relationship and rejected at every turn any opportunity to interact with the child or discuss his wellbeing. In his opposition to the private adoption, he did not acknowledge C.J.P. Green

---

[1] This Court's decision in *In Int. of E.C.B., supra*, was vacated by the Louisiana Supreme Court, apparently after it was determined by DNA testing that the appellant-father was not, in fact, the birthfather.

12

merely requested DNA testing and a stay of adoption proceedings, pending the results of those tests.

The facts of this case are more analogous to *In re Adoption of J.L.G.*, 01-0269 (La. App. 1 Cir. 2/21/01), 808 So. 2d 491. In *In re Adoption of J.L.G, supra*, the birthfather claimed that he did not support the birthmother because she did not request support from him. The court noted that La. Ch. C. art. 1138 "does not refer to providing support 'if requested.' A father who is committed to his parental responsibilities will offer support to his child without being asked." *Id.* at 495. Additionally, the birthmother did not request support because she knew her request would be in vain. Similarly, in this case, Payton testified that she did not believe Green would follow through on offers to provide financial support, which beliefs have proven to be well founded. Finally, the birthfather in *In re Adoption of J.L.G., supra,* lived at home with his mother, as does Green. The court found that the father "has the burden of showing his *own* commitment to his parental responsibilities, *not* the commitment of his *family*." *Id.* at 500.

The trial court did not err in finding that Green failed to meet his burden of proof in establishing a substantial commitment to his parental responsibilities. This assignment of error is without merit.

**Assignment of Error No. 3:**     **The trial court erred by finding Green would not be a fit parent.**

Green argues that the trial court erred by finding that Green is an unfit parent.

La. Ch. C. art. 1103(5) provides the definition for parental fitness, as follows:

(5) "Parental fitness" means:

(a) That a parent has not abused the child. For purposes of this Subparagraph, abuse means the infliction of physical or mental injury which causes deterioration to the child, sexual abuse, exploitation, or overworking of a child to such an extent that his health or moral or emotional well-being is endangered.

(b) That a **parent has consistently offered to provide reasonably necessary food, clothing, appropriate shelter, or treatment for the child.** For purposes of this Subparagraph, treatment means medical care or other health services provided in accordance with the tenets of a well-recognized religious method of healing with a reasonable, proven record of success.

(c) That a parent suffers from no medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency which makes him unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.

(d) Viewed in its entirety, **the parent's past or present conduct, including his criminal convictions, would not pose a risk of substantial harm to the physical, mental, or emotional health of the child**.

In support of his claims, Green again cites *In Int. of E.C.B., supra.* In that case, an 18-year old birthfather opposed the private adoption that the child's birthmother initiated without his consent. Green argues that he did not have the opportunity to display fitness because he was never given the chance to be in close proximity to C.J.P. prior to the surrender to the adoptive parents. Green argues that the Covid-19 pandemic presented unique challenges to establishing a relationship with C.J.P. Green asserts that he has never abused C.J.P., and does not suffer from medical or emotional illness, mental deficiency, physical disability, or substance dependency. Green does not deny his criminal history but notes that he has never been convicted of any crimes listed in La. Ch. C. art. 1015, which are crimes that trigger an involuntary termination of parental rights.

14

We find this matter to be distinguishable from the facts in *In Int. of E.C.B., supra.* Contrary to the birthfather in *In Int. of E.C.B., supra,* Green has a lengthy criminal history, including two incarcerations, totaling 8 years. La. Ch. C. art. 1103(5) specifically includes criminal convictions as a factor in the determination of parental fitness. La. Ch. C. art. 1103(5) does not expressly limit its scope to the crimes enumerated in La. Ch. C. art. 1015, as Green argues. Additionally, the trial court correctly considered all of Green's past behavior, particularly with regard to how he has parented his other five children, in reaching its conclusion regarding Green's fitness as a parent.

Aside from his criminal history, the trial court noted that Green demonstrated a pattern of behavior which included a failure to *consistently* offer to provide reasonably necessary food, clothing, appropriate shelter, or treatment for his other five children, who all primarily reside with their mothers, aside from one teenage child who resides with *his* mother. None of Green's children's mothers receive any child support from him, and there was no evidence that Green ever offered consistent support of any kind, as required by La. Ch. C. art. 1103(5). Green could offer no evidence of actually providing any financial support of Payton during her pregnancy or delivery. Finally, the trial court specifically noted the number of years that Green spent incarcerated during each of his five other children's lives. As such, the trial court did not commit manifest error in reaching its conclusion that Green did not carry his burden of proof to show that he is a fit parent to C.J.P., and this assignment of error is without merit.

**Assignment of Error No. 4:** **The trial court erred by terminating the parental rights of Green.**

Green argues that the trial court erred in terminating his parental rights because he satisfied the requirements set forth in La. Ch. C. art. 1138. Specifically, he acknowledged that he is C.J.P.'s father, proved that he manifested a substantial commitment to his parental responsibilities, and proved that he is a fit parent of his child.

La. Ch. C. art. 1138(D) provides that if the father has failed to establish his parental rights, i.e. satisfy each of the three elements provided in La. Ch. C. art. 1138(A), the court **shall** decree that his parental rights are terminated. As described herein, the trial court, in considering the credibility of witnesses and weighing all of the evidence, correctly found that Green failed to manifest a substantial commitment to his parental responsibilities and prove that he was a fit parent of C.J.P.

As to acknowledgment of C.J.P., the record shows that Green did not sign the birth certificate, did not file with the Putative Father Registry, and did not execute an authentic act acknowledging his paternity. Therefore, Green did not legally acknowledge C.J.P., in accordance with La. C. C. art. 196. The trial court held that Green did not legally acknowledge paternity of C.J.P. until the DNA test results were admitted into evidence at the trial. As previously noted, we conclude that the trial court's factual finding related to Green's acknowledgment of C.J.P. was not manifestly erroneous.

Despite Green's assertions that legal acknowledgment pursuant to La. C. C. art. 196 is not required to establish his parental rights, we also find that he has failed to satisfy the other two elements contained in La. Ch. C. art. 1138(A), namely, proving that he has manifested a substantial commitment

16

to his parental responsibilities and that he is a fit parent of his child. Therefore, the trial court's reliance on the applicable Louisiana law in rendering its decree terminating Green's parental rights is not erroneous and is statutorily mandated by La. Ch. C. art. 1138(D). This assignment of error is likewise without merit.

## CONCLUSION

Considering the foregoing, the judgment of the trial court terminating Green's parental rights is affirmed.

**AFFIRMED.**